**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**SUPER TOYS, INC., Respondent.**

No. 71–1450.

United States Court of Appeals, Ninth Circuit.

March 29, 1972.

Stephen H. Naiman (argued), Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Assoc. Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, Herman M. Levy, Washington, D. C.; Abraham Siegel, Los Angeles, Cal., for petitioner.

David G. Moore (argued) of Reid, Babbage & Coil, Riverside, Cal., for respondent.

George Pappy, of Brundage, Neyhart, Miller, Ross & Reich, Los Angeles, Cal., for the charging party.

Before HAMLEY, HUFSTEDLER and WRIGHT, Circuit Judges.

HUFSTEDLER, Circuit Judge:

The National Labor Relations Board petitions for enforcement of its order against respondent based upon its findings that respondent violated section 8(a) (3) and (1) of the National Labor Relations Act by discharging its employee Calvaresi for engaging in union activities and that it violated section 8(a) (1) of the Act by interrogating Calvaresi and Epstein regarding their union activities.

The first issue is whether or not the Board's finding that Calvaresi was discharged for his union activities, rather than for good cause, is supported by substantial evidence in the record considered as a whole. We hold that it is not.

Respondent is a toy supplier. Its main office is in Detroit, Michigan. It maintains several branch offices, including one in North Hollywood where Calvaresi was employed initially as a freelance salesman and later as a driver with responsibility for supplying toys and installing toy racks at retail stores. In early December 1969, Calvaresi collected company money in the sum of $220 from a "swap meet" and appropriated it to his own use. When respondent's branch manager Boigon discov-ered Calvaresi's defalcation in mid-December Calvaresi apologized for his action, pleaded not to be discharged, and promised to reimburse the company. Boigon agreed to Calvaresi's proposal.

On December 29, 1969, Boigon announced that there were going to be some operational changes and called an employee's meeting for January 3, 1970. Calvaresi and two of his fellow drivers, Epstein and Diamond, were worried that the changes might adversely affect their employment or income. The trio arranged a meeting with a representative of the Teamsters Union at Calvaresi's home. On the evening of December 29 they met with the union representatives. All three signed cards authorizing the union to represent them, and each agreed to deny any knowledge of the union if he were questioned by the respondent. The drivers asked the union man to notify respondent of its representation status before January 3, to avert changes in their employment.

Boigon advanced the employment meeting to January 2. The three drivers attended. Boigon told the employees about some of the changes to be effective January 5, including Diamond's promotion to supervisor of warehouse and truck operations and Calvaresi's taking over Diamond's former route as a driver. Epstein's status was not changed. At the conclusion of the meeting, Boigon assured the employees that "Everybody has got a job at Super Toys."

Boigon testified that on the evening of January 2, after the employees' meeting, the president of respondent telephoned him from Detroit and told him that he had received information from an employee of the company traveling in Michigan that Calvaresi had misappropriated company funds. The president instructed Boigon to discharge Calvaresi immediately. Early the next morning Boigon related both to Brown, assistant manager, and to Epstein the president's direction to discharge Calvaresi. The conversations took place before the morning mail arrived in which there was a letter to Boigon from the union

advising him that it had been designated as the three drivers' bargaining representatives. Boigon's testimony on these points was corroborated by Brown and Epstein. There was no contrary testimony.

After receiving the union letter, Boigon telephoned Diamond, told him about the letter, and asked him what he knew about it. Diamond said he would come to the office to talk. Next, Boigon called Calvaresi and asked him about his knowledge of the union. Calvaresi denied any affiliation with or knowledge of the union. Diamond went to Boigon's office and told him about signing the union cards. Calvaresi came to Boigon's office while Diamond was still talking to Boigon. Diamond indicated that he had told Boigon everything and left. Calvaresi said to Boigon, "Since you've heard Mr. Diamond's story, I might as well tell you my part of the story." Calvaresi testified that Boigon said, "[I]f you want the union here, it makes no difference; it makes no difference about who started it, or what. . . . I have got to let you go on account of Detroit. . . . And he said . . . [I] had to let [you] go because [I] got a call Friday night from Detroit that they had to let [you] go on account of the swap meet money."

There were no reprisals or threats of reprisals for the union activity of Epstein and Diamond. Diamond received his promotion and Epstein remained in his job. Some of the other plants and warehouses of respondent are union organized.

The hearing examiner decided that Calvaresi's discharge was pretextual despite the uncontradicted evidence that the company president ordered the discharge before either he or Boigon had been informed that Calvaresi had engaged in union activity. His theory was that it was "illogical and unreasonable" that the president should order Calvaresi to be "suddenly" fired, because the home office had previously condoned Calvaresi's misappropriation. There is no evidence in the record that the home office had ever condoned Calvaresi's misconduct. There is, at best, merely an inference that can be drawn from some of the evidence that the home office had some actual knowledge of Calvaresi's misconduct more than a day or two before the president's call.

■ The record as a whole convincingly demonstrates that the president acted to discharge Calvaresi as soon as he learned of his dishonesty and that his act had nothing to do with Calvaresi's union activity of which the president was completely unaware. It follows that the hearing examiner's conclusions, adopted by the Board, cannot be sustained. (*Cf.* Santa Fe Drilling Co. v. N. L. R. B. (9th Cir. 1969) 416 F.2d 725, 732; N.L.R.B. v. Miller Redwood Co. (9th Cir. 1969) 407 F.2d 1366.)

■ The second issue is whether or not the respondent violated section 8(a)(1) of the Act by asking Calvaresi and Epstein about their union activities. Such interrogation is not unlawful per se. "If he [employer] does make an investigation, the Board's recent cases indicate that reasonable polling in this regard will not always be termed violative of § 8(a)(1) if conducted in accordance with the requirements set out in Struksnes Construction Co., 165 NLRB No. 102, 65 L.R.R.M. 1385 (1967)." N.L.R.B. v. Gissel Packing Co. (1969) 395 U.S. 575, 609, 89 S.Ct. 1918, 1938, 23 L. Ed.2d 547.

The criteria stated in *Struksnes, supra,* are these:

"Absent unusual circumstances, the polling of employees by an employer will be violative of Section 8(a)(1) of the Act unless the following safeguards are observed: (1) the purpose of the poll is to determine the truth of a union's claim of majority, (2) this purpose is communicated to the employees, (3) assurances against reprisal are given, (4) the employees are polled by secret ballot, and (5) the employer has not engaged in unfair

labor practices or otherwise created a coercive atmosphere."[1]

The Board upheld the examiner's conclusion that respondent's interrogation of its employees was inherently coercive because respondent did not comply with the requirement of *Struksnes*. We do too.

 The record shows that respondent's interrogation of its employees was unaccompanied by any threat of reprisal, but it also shows that the respondent's interrogation was unaccompanied by any express assurances against reprisal.

That portion of the Board's order directing that respondent shall cease and desist from polling or otherwise coercively interrogating employees concerning their support of the union and ordering affirmative action to implement that part of the order will be enforced. We decline to enforce the remainder of the Board's order.

---

1. Among the circuits that have adopted the Struksnes criteria are the Seventh (N.L.R.B. v. C & P Plaza Dept. Store, Div. of C & P Shop. Ctr., Inc. (7th Cir. 1969) 414 F.2d 1244) and the Eighth (N.L.R.B. v. Harry F. Berggren & Sons, Inc. (8th Cir. 1969) 406 F.2d 239).