**J. M. TANAKA CONSTRUCTION, INC., Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

**R. M. TANAKA CONSTRUCTION, INC., Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

**Nos. 80–7252, 80–7274 and 80–7345.**

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Oct. 21, 1981.

Decided April 26, 1982.

Rehearing and Rehearing En Banc Denied June 15, 1982.

---

Barry W. Marr and Sidney Kanazawa, Honolulu, Hawaii, argued, for R. M. Tanaka; Torkildson, Katz, Jossem & Loden, Honolulu, Hawaii, on brief.

Kinji Kanazawa, Harilyn S. Mau, Sidney Kanazawa, Walter H. Ikeda, Honolulu, Hawaii, for J. M. Tanaka.

Susan L. Dolin, N. L. R. B., Washington, D. C., for N. L. R. B.

Before ALARCON, POOLE and FERGUSON, Circuit Judges.

POOLE, Circuit Judge:

J. M. Tanaka Construction Company (J. M. Tanaka) and R. M. Tanaka Construction Company (R. M. Tanaka) petition for review of a National Labor Relations Board (Board) order. The order adopted the findings of fact and conclusions of law of the Administrative Law Judge (ALJ) and substantially adopted the ALJ's recommended order.

The Board found that J. M. Tanaka and R. M. Tanaka were alter egos and thus constituted a single employer within the meaning of the National Labor Relations Act (Act). So finding, the Board held the companies to be in violation of § 8(a)(1) and (5) of the Act by virtue of their (1) unilateral withdrawal of recognition from the union and repudiation of an existing collective bargaining agreement, (2) failure to make fringe benefit payments to the union, (3) requirement that employees sign an agreement that the company is nonunion, and (4)

interrogation of employees with respect to union activities and sympathies.

We grant the Board's cross-petition for enforcement.

FACTS

Prior to the events at issue here, J. M. Tanaka was a construction company headquartered in Honolulu with operations on Oahu and in Kona. Raymond Tanaka (Tanaka) is J. M. Tanaka's president and owns eight percent of the corporation. His mother, brother and an uncle, Thomas Tanaka, collectively own 78%, the remaining shares are held by Tanaka's sisters and cousins.

At one time, J. M. Tanaka was involved in specialized and sophisticated projects such as bridge, reservoir and tunnel construction. Its Kona operation was less sophisticated, consisting primarily of paving and subdivision work. In 1978, its workforce numbered approximately 50, including 33 to 35 engineers in Kona and approximately three engineers located in Honolulu, all members of the Operating Engineers Local 3. A collective bargaining agreement effective until 1980 existed between J. M. Tanaka and Local 3.

For a number of years, J. M. Tanaka had suffered heavy financial losses, apparently stemming from its more sophisticated projects. A financial crisis was reached in August, 1978, when Local 3 threatened to pull its men off J. M. Tanaka jobs because the company's fringe benefit payments to the union were some $61,000 in arrears.

That same month, R. M. Tanaka, a construction company headquartered in Kona, was incorporated with Tanaka as sole shareholder and president. Takeo Wakida, Tanaka's uncle and the former general manager of J. M. Tanaka's Kona operations, was made vice-president. On September 14, 1978, J. M. Tanaka closed down operations and discharged its workers.[1]

The new R. M. Tanaka company arranged to buy the bulk of J. M. Tanaka's equipment through an agreement of sale, and to lease J. M. Tanaka's Kona facilities. In

---

1. It appears that Local 3 did not withdraw its members from J. M. Tanaka.

early October, 1978, seven or eight engineers who had formerly worked for J. M. Tanaka were called to work for R. M. Tanaka. Another 25 former J. M. Tanaka employees began work ostensibly employed by Prime Electric, Inc., but actually working for R. M. Tanaka.[2] At the hearing before the ALJ, Tanaka testified that R. M. Tanaka is now engaged in essentially the same work formerly performed by J. M. Tanaka's Kona operation. In February the engineers on Prime Electric's payroll were transferred to R. M. Tanaka. All of J. M. Tanaka's engineers were ultimately called back to work for R. M. Tanaka, and one or two new engineers were hired.

R. M. Tanaka paid the workers the equivalent of union wages, and paid benefits required by state law, but did not pay the various fringes provided in the collective bargaining agreement between J. M. Tanaka and the union. As part of the application process, the employees hired directly by R. M. Tanaka and those ostensibly hired by Prime Electric were required to sign an agreement acknowledging R. M. Tanaka to be a nonunion employer, agreeing that required fringe benefit payments on government contracts be paid directly to the employees, and promising to reimburse the payments to the union in the event of a dispute.

Around November, 1978, Wakida asked some of the employees whether they had signed union authorization cards. This interrogation was allegedly in response to a complaint that the union was coercing employees to sign authorizations. On a number of occasions in January and February, William Crozier, Local 3's business agent, demanded union recognition from R. M. Tanaka. R. M. Tanaka refused to recognize the union without an election, citing financial reasons.

On this appeal J. M. Tanaka and R. M. Tanaka argue that there was insufficient evidence to support the Board's determination that the two companies were alter

egos. R. M. Tanaka also argues (1) it was denied due process in the hearing before the ALJ, and (2) the Board erred in finding that R. M. Tanaka had violated § 8(a)(1) by its interrogation of employees and its requirement that employees sign agreements acknowledging the company's nonunion status.

DISCUSSION

I. *Alter Ego*

The Board's finding that R. M. Tanaka violated §§ 8(a)(1) and (5) by withdrawing recognition from the union, repudiating the collective bargaining agreement and failing to make fringe benefit payments to the union, and the imposition of liability on J. M. Tanaka, turns on whether the two companies are alter egos. *Cf. NLRB v. Triumph Curing Center*, 571 F.2d 462, 467 (9th Cir. 1978).

■ Petitioners argue that there is insufficient evidence to support a finding that the two corporations constitute a single employing enterprise. A conclusion by the Board that two corporations are alter egos is essentially factual and may not be disturbed if, looking at all the evidence, substantial evidence supports the determination. *NLRB v. Lantz*, 607 F.2d 290, 295 (9th Cir. 1979). *See NLRB v. Triumph Curing Center*, 571 F.2d at 468.

■ In determining whether two businesses are alter egos, a court must consider the following factors: (1) centralized control of labor relations, (2) common management, (3) interrelation of operations, and (4) common ownership and financial control. *Radio Union v. Broadcast Service*, 380 U.S. 255, 256, 85 S.Ct. 876, 877, 13 L.Ed.2d 789 (1965); *NLRB v. Lantz*, 607 F.2d at 295; *NLRB v. Don Burgess Construction Corp.*, 596 F.2d 378, 384 (9th Cir. 1979). No factor is controlling and all need not be present. *NLRB v. Lantz*, 607 F.2d at 295; *NLRB v. Don Burgess Construction Corp.*, 596 F.2d at 384.

The Board dismissed the unfair labor practice charges against Prime Electric.

---

**2.** Prime Electric, a party to the proceeding below, carried the employees on its payroll because R. M. Tanaka had a cash flow shortage.

The most important single factor is centralized control of labor relations. *Los Angeles Marine Hardware Co. v. NLRB*, 602 F.2d 1302, 1305 (9th Cir. 1979). The Board found, and Tanaka's testimony at the hearing clearly supports, that Wakida was in charge of day-to-day labor relations in Kona for both J. M. Tanaka and R. M. Tanaka. Tanaka himself had ultimate control of labor relations for both companies. Although Wakida was given increased authority when he went to work for R. M. Tanaka, the evidence demonstrates that he and Tanaka jointly controlled labor relations for both corporations. Thus this important element in determining alter ego status is strongly supported by the record.

Substantial evidence also supports a finding that J. M. Tanaka and R. M. Tanaka shared common management. J. M. Tanaka was once a state-wide operation centered in Honolulu, while R. M. Tanaka's activities were limited to the Kona area. The effect of this difference is only significant, however, in that it suggests that R. M. Tanaka became the alter ego of what had been J. M. Tanaka's Kona operations, not of the former state-wide J. M. Tanaka entity. An alter ego relationship may exist when only a portion of an enterprise is purportedly transferred to a new owner. *See, e.g., Los Angeles Marine Hardware v. NLRB*, 602 F.2d 1302; *NLRB v. Burgess Construction Corp.*, 596 F.2d 378. Further, by the summer of 1978, J. M. Tanaka's operations outside of Kona had become minimal, with 33 to 35 engineers located in Kona, as compared to "about three" in Honolulu. Petitioners point to differences in headquarters locations—that J. M. Tanaka was headquartered in Honolulu near Tanaka's residence while R. M. Tanaka operates from Kona, on the island of Hawaii. They also lay emphasis on the fact that, except for Tanaka, the officers of the two companies were different. The answer to these arguments is that Wakida was in charge of daily operations on Kona for both J. M. Tanaka and R. M. Tanaka; that he and Tanaka constituted the effective management of both companies; and, finally, that it is actual and not merely potential control that is determina-

tive. *Poole's Warehouse, Inc.*, 158 N.L.R.B. 1281, 1286 (1966).

The evidence also indicates a close interrelation between the operations of the two construction companies. R. M. Tanaka took over J. M. Tanaka's Kona operation complete with office and staff, shop, asphalt plant, quarry, supervisors Wakida and Onumo, all of J. M. Tanaka's engineers and virtually all of its other employees. Most of R. M. Tanaka's supplies were purchased from J. M. Tanaka suppliers. R. M. Tanaka acquired most of J. M. Tanaka's equipment including, in Tanaka's own words, "practically 100%" of the equipment located on Kona. R. M. Tanaka also succeeded J. M. Tanaka on two unfinished projects. While at one stage, J. M. Tanaka's operations may be said to have been more sophisticated, by 1978 J. M. Tanaka's projects were largely the same as those later engaged in by R. M. Tanaka. Both companies were originally represented by the same attorney in these proceedings. R. M. Tanaka later substituted separate counsel, and it is noteworthy that J. M. Tanaka's counsel did not appear after the first day's hearing, despite J. M. Tanaka's not inconsiderable potential liability.

Petitioners suggest other indicia of differences between J. M. Tanaka and R. M. Tanaka: the use of different accountants, insurance carriers and estimators; and to some extent different suppliers. In our view, none of these suffice to counter the strong evidence of interrelations of operations. Nor is the balance shifted by testimony that R. M. Tanaka uses primarily asphalt, rather than concrete, and does a smaller percentage of its work on government contracts. Aside from the fact that these percentage figures fluctuate, some of the apparent dissimilarity may be accounted for by the difference between J. M. Tanaka's Kona operation contrasted with its now-defunct state-wide operation.

The factor most challenged by the record is that of common ownership and control. J. M. Tanaka is owned by twenty-two individuals, among whom Tanaka's in-

terest is only eight percent. In contrast, Tanaka is the sole owner of R. M. Tanaka. Common ownership, however, is but one, and not always an important factor to be considered in determining the existence of an alter ego relationship. *NLRB v. Lantz,* 607 F.2d at 295; *Los Angeles Marine Hardware Co. v. NLRB,* 602 F.2d at 1305; *NLRB v. Don Burgess Construction Corp.,* 596 F.2d at 384; *NLRB v. Triumph Curing Center,* 571 F.2d at 468. It is not a necessary prerequisite to an alter ego finding. *NLRB v. Lantz,* 607 F.2d at 295; *NLRB v. Don Burgess Construction Corp.,* 596 F.2d at 384. Moreover, all the J. M. Tanaka owners are members of the Tanaka family, and Tanaka clearly dominated both corporations. *See Shield Pacific, Ltd.,* 245 N.L.R.B. 415 (1979).

There is also substantially undisputed evidence that R. M. Tanaka was created for the purpose of eliminating the high cost of dealing with the union. The conduct of a supervisor is attributable to his employer. *See NLRB v. International Medication Systems, Ltd.,* 640 F.2d 1110, 1112 (9th Cir. 1981); *Butler-Johnson Corp. v. NLRB,* 608 F.2d 1303, 1305–06 (9th Cir. 1979). Wakida, stipulated to be a supervisor within the meaning of the Act and found by the ALJ to be a credible witness, testified that upon discharging J. M. Tanaka workers he promised that they would be called back to a nonunion company. After R. M. Tanaka was formed, Wakida and Tanaka resisted union demands for recognition citing financial hardship, particularly because of nonunion competition. William Crozier, the union's business manager, testified that he informed Wakida that R. M. Tanaka was required to deal with the union because it was an alter ego.

> (H)e asked me what is an alter ego company; what is that. So I explained to Mr. Wakida that an alter ego company is a company that is formed specifically to get away from a Union contract. He said, "Yes, we did that, but I'm still not going to recognize you."

This record discloses substantial evidence supporting the Board's finding that R. M. Tanaka is the alter ego of J. M. Tanaka.

Finally, J. M. Tanaka claims that equitable considerations bar imposing liability on it. It argues that the equipment sale to R. M. Tanaka was a means of paying off its debts to the union instead of filing bankruptcy. R. M. Tanaka's monthly payments to J. M. Tanaka pursuant to the equipment contract of sale are, of course, made possible in part by the fact that R. M. Tanaka is not paying fringe benefits to the union. Thus the combined entity of J. M. Tanaka and R. M. Tanaka has been able to allocate funds to pay past owing fringe benefits by the device of evading present fringe benefit payments. Such avoidance of financial burdens does not constitute a defence to § 8(a)(1) and (5) violations. *Los Angeles Marine Hardware Co. v. NLRB,* 602 F.2d at 1307. *See NLRB v. Lantz,* 607 F.2d 290. J. M. Tanaka might legitimately have sought to renegotiate its collective bargaining agreement with the union in order to preserve jobs held by union members as well as to stave off insolvency. Its attempt to avoid the burden imposed by the collective bargaining agreement by transferring its operations to R. M. Tanaka amounts to clear violation of the Act.

## II. *Due Process*

### A. *Failure to grant a continuance after substitution of counsel*

R. M. Tanaka and J. M. Tanaka were originally represented by the same attorney, Kinji Kanazawa. When the case failed to settle prior to hearing, Kanazawa withdrew from his representation of R. M. Tanaka and that corporation substituted new counsel. Its request for a continuance in order to prepare for trial was denied by the ALJ.

Grant or denial of a continuance is within the ALJ's discretion. *NLRB v. Pan Scape Corp.,* 607 F.2d 198, 201 (7th Cir. 1979); *NLRB v. Interboro Contractors, Inc.,* 432 F.2d 854, 860 (2d Cir. 1970). Abuse of discretion justifying reversal requires that the ruling "is demonstrated to clearly prejudice the appealing party." *NLRB v. Pan Scape Corp.,* 607 F.2d at 201; *Electromec*

*Design & Development Co. v. NLRB*, 409 F.2d 631, 635 (9th Cir. 1969). In this case, the focus of the hearing was R. M. Tanaka's status as an alter ego, thus the relevant facts should have been within its own knowledge. Further, R. M. Tanaka's original counsel should have foreseen that the parties' failure to settle before trial might necessitate his withdrawal from the representation of one of the parties. Under these circumstances, we find no abuse of discretion in the refusal to continue the proceedings. *See NLRB v. Interboro Contractors, Inc.*, 432 F.2d at 860.

█ R. M. Tanaka also charged that the ALJ's over-concern with dispatch compromised the parties' right to a fair hearing. This is simply not supported by the record. All parties were permitted to present their case fully.

### B. *Amendment to the complaint*

█ Section 10(b) provides that an action must be brought within six months of the events the subject of the complaint, but permits an ALJ, in the exercise of his discretion, to allow amendment of a complaint during the proceedings. 29 U.S.C. § 160(b). Amendments closely related to the original charges are deemed filed at the time the original complaint issued. *See NLRB v. Fant Milling Co.*, 360 U.S. 301, 79 S.Ct. 1179, 3 L.Ed.2d 1243 (1959); *NLRB v. Jack La Lanne Management Corp.*, 539 F.2d 292, 295 and n.1 (2d Cir. 1976). In this case, the original complaint had been filed February 5, 1979. On the second day of the hearing, the ALJ permitted the General Counsel to amend the complaint to charge that R. M. Tanaka, in October of 1978, unlawfully coerced employees to sign an agreement that the company was nonunion. Had the ALJ refused to allow the amendment, the new charge would have been time-barred. We find that the additional allegation was related to the same series of allegedly unfair labor practices designed to keep R. M. Tanaka nonunion. *See NLRB v. Jack La*

**3.** Wakida testified that applicants for both R. M. Tanaka and Prime Electric signed essential-

*Lanne Management Corp.*, 539 F.2d at 295. The grant of the amendment was within the ALJ's discretion. Thus there was no violation of R. M. Tanaka's procedural due process rights.

### III. *Section 8(a)(1) violation*

#### A. *The employment agreement*

█ R. M. Tanaka required job applicants to sign the following agreement:

> We the undersigned do hereby agree to the following terms during our employment with Prime Electric, Inc. which is an "Open-Shop" company.
> (1) If working on a City, County, State or Federally funded contract, all fringes shall be paid wholly and directly to me and not the Union which I may be affiliated with.
> (2) Should a problem arise with the Union, I will be responsible for all reimbursements of fringe benefits given.[3]

Section 8(a)(1) of the Act provides:

> It shall be an unfair labor practice for an employer . . . to interfere with, restrain, or coerce employees in the exercise of rights guaranteed under section 157 of this title [giving employees the right to organize and bargain collectively].

29 U.S.C. § 158(a)(1). R. M. Tanaka maintains that this agreement does no more than truthfully advise employees that R. M. Tanaka is a nonunion company. An essentially similar claim, however, was rejected by this court in *Kallman v. NLRB*, 640 F.2d 1094 (9th Cir. 1981). In *Kallman*, the employer told a former employee of his predecessor that he would be hired under the same conditions as before, but that the business "will not be Union." *Id.* at 1097. The employer claimed that the statement was not a § 8(a)(1) violation because it merely stated the fact and expressed his view of the company's status when made. This court held that the statement implied that the business would remain nonunion, and thus violated § 8(a)(1). *Id.* at 1097–98.

*ly similar agreements.*

The present case presents an even greater restraint on the exercise of employees' right to organize, because they were required to sign the statement as part of the application process, and might reasonably conclude that they had executed a binding agreement to remain nonunion.

### B. *The interrogation*

Wakida conceded that, after receiving complaints that employees were being pressured into signing union authorization cards, he asked three or four employees, "What did you have to sign for?" The Board found the interrogation to be a § 8(a)(1) violation.

An employer's interrogation of employees with respect to union activities is not per se unlawful. *NLRB v. Super Toys, Inc.*, 458 F.2d 180, 182 (9th Cir. 1972); *Amalgamated Meat Cutters Local 364 v. NLRB*, 435 F.2d 668 (9th Cir. 1970). The interrogation is inherently suspect, however, and is coercive under this section unless express assurances against reprisals are given. *NLRB v. Vancouver Plywood Co.*, 604 F.2d 596, 599 n.1 (9th Cir. 1979); *NLRB v. Super Toys, Inc.*, 458 F.2d at 182–83.

In this case, substantial evidence supports the Board's determination that the interrogation was coercive. The questions were addressed to others than the employee alleged to have made the complaint, and Wakida apparently did not explain the reason for the questions or make assurances that there would be no reprisals. In the light of the company's pattern of hostility toward the union, the questioned workers could reasonably conclude that the interrogation was intended to be coercive.

We enforce the Board's order in its entirety.