Adelina GARCIA, et al., Plaintiffs,

v.

**HUDSON LUMBER COMPANY, a corporation, et al., Defendants.**

### No. C–85–8688–WWS.

United States District Court,
N.D. California.

May 6, 1987.

Richard N. Dinallo, Paul A. Frasetto, Law Offices of Richard N. Dinallo, San Francisco, Cal., for plaintiffs.

Francis Carling, Leo T. Crowley, Winthrop, Stimson, Putman & Roberts, New York City, and Steven R. Feldstein, Cynthia L. Jackson, Dian B. Emerson, Michele Modena–Kurpinsky, Heller, Ehrman, White & McAuliffe, San Francisco, Cal., for Hudson Lumber Co.

Morton H. Orenstein, Thomas E. Geidt, SchachterKristoff, Ross, Sprague and Curiale, San Francisco, Cal., for defendants Hudson ICS, David M. Radin, Charles Novotny, Robert Hanscomb, William Morris and Alan Lima.

Bernard Jolles, Robert A. Sacks, Jolles, Sokol & Bernstein, P.C., Portland, Or., for Production Carpenters Local Union No. 2559.

## ORDER

SCHWARZER, District Judge.

Defendant Hudson Lumber Company ("HLC") moves for summary judgment against plaintiffs. Defendants Hudson I.C.S. and the individual owners of Hudson I.C.S. ("HICS") move for summary judgment and Rule 11 sanctions against plaintiffs.

HLC, a wholly owned subsidiary of the Berol Corporation (Berol), operated a slat-mill business in San Leandro, California. The employees of HLC were represented by the Production Carpenters Union, Local No. 2559 ("the Union"). A collective bargaining agreement (CBA) covered the terms and conditions of their employment.

Early in 1985, Berol decided to divest itself of its slat-mill business. Several of HLC's managers, the individually named defendants in this action, approached Berol concerning the possibility of acquiring HLC's San Leandro assets by means of a leveraged buyout. On March 8, 1985, the managers formed a new company, HICS, for the purpose of attempting to acquire the San Leandro plant and keep it in operation.

Berol and HICS entered into negotiations for the sale and purchase of the San Leandro plant. During the negotiations, HICS and Berol were represented by separate legal counsel. On May 29, 1985, the parties entered into a fifty-one page agreement of sale, which provided for a purchase price of five million dollars plus the assumption by HICS of certain liabilities totaling more than three million dollars. The agreement also provided that HICS would supply pencil slats to Berol at a price equal to HICS's lowest market sales rate. The closing date for the transaction was June 21, 1985.

On May 29, 1985, the same day that the agreement was reached between Berol and HICS, Berol informed its approximately 400 employees that it was discontinuing its operations and therefore terminating all its employees. It informed the employees that they were locked out of the facility, and that HICS would reopen the facility several weeks later. The employees were told that they could apply for employment positions with HICS.

In the following weeks, HICS hired its own work force consisting almost entirely of former HLC employees. However, because HICS cut back on the operating hours of the plant, the work force was reduced to approximately 230 employees. HICS commenced operations on June 24, 1985.

HICS did not assume the CBA which existed between HLC and the Union. However, HICS did enter into negotiations with the Union and, on November 19, 1985, entered into a new CBA which was subsequently ratified by HICS employees. The new CBA provided somewhat reduced benefits to employees.

In June, 1985, HLC and the Union negotiated over the effects that the plant's closure would have on those employees not hired back by HICS. On July 2, 1985, the parties entered into a Memorandum of Agreement in which HLC agreed to award some severance pay and health and welfare benefits to most employees not hired back. In return, the Union conceded that the CBA would have no further legal effect.

Plaintiffs in this action were among those not hired back by HICS. None of the plaintiffs filed a grievance with the Union concerning their initial termination in accordance with the CBA. However, they present a declaration of Maria Merrill, the daughter of one of the plaintiffs, which states that the Union did not answer the telephone at its Oakland office for several weeks following the plant's closure.

On July 7, 1985, Merrill mailed to the Union's Sacramento office a letter complaining that her mother received no prior notice of the May 29 shut-down and inquiring when her mother would be able to retrieve her personal belongings from her work locker. The letter also criticized the Union for its failure to communicate with HLC employees about the lay-off, and requested information about severance pay, medical insurance, and company pension plans. The Union responded one week later, stating that an agreement had already been reached between HLC and the Union regarding the benefits to be awarded to those HLC employees not hired back by HICS.

It is undisputed that, although they were former managers of HLC, none of the owners of HICS had or has any ownership interest in HLC or Berol. Likewise, none of the owners of HLC or Berol retained an ownership interest in HICS.

Plaintiffs originally filed this complaint on November 26, 1985, against defendants HLC, HICS, Berol, and the Union. The complaint alleged the following causes of action: 1) breach of the collective bargaining agreement; 2) wrongful discharge; 3) intentional infliction of emotional distress;

and 4) breach of the duty of fair representation against the Union.

On March 21, 1986, this Court dismissed the complaint against Berol on the ground that the complaint did not state a claim against it. On April 9, 1986, this Court dismissed the wrongful discharge and intentional infliction of emotional distress claims as preempted by federal law. On May 30, 1986, this Court dismissed the complaint against the Union as barred by the applicable statute of limitations.

## DISCUSSION

Summary judgment is proper when the non-moving party fails to show that there exists a genuine issue of material fact and the moving party is entitled to a judgment as a matter of law. *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); Fed.R.Civ.P. 56(c). Put another way, summary judgment must be granted, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. *Celotex,* 106 S.Ct. at 2552–53.

### I. *Claims against HICS*

Plaintiffs argue that HICS breached the collective bargaining agreement which existed between HLC and the Union. Their argument is necessarily premised on the theory that HICS and HLC are "alter egos" of one another.

■ A successor company is ordinarily not bound by a CBA entered into by its predecessor. *Kallman v. NLRB,* 640 F.2d 1094, 1103 (9th Cir.1981). But a successor company which is the alter ego of its predecessor is bound. *J.M. Tanaka Constr., Inc. v. NLRB,* 675 F.2d 1029, 1033–35 (9th Cir.1982). "In determining whether two businesses are alter egos, a court must consider the following four factors: (1) centralized control of labor relations, (2) common management, (3) interrelation of operations, and (4) common ownership and financial control." *Id.* at 1033; *see also Carpenters' Local Union No. 1478 v. Stevens,*

743 F.2d 1271, 1276 (9th Cir.1984), *cert. denied,* 471 U.S. 1015, 105 S.Ct. 2018, 85 L.Ed.2d 300 (1985). The focus of the inquiry is "whether there is an attempt to avoid the obligations of a collective bargaining agreement through a sham transaction or a technical change in operation." *Carpenters' Local,* 743 F.2d at 1277.

■ In this case the first three factors which normally signal an alter ego transaction are present. Because of the nature of the transaction, however, those factors do not constitute a reliable indication that a sham transfer has occurred. After the usual sale of a business, one expects changes in management, operations, and control over labor relations. The absence of change may therefore be evidence of a sham transaction. After a leveraged buy-out by management, however, the management, operations, and control over labor relations of the successor company will almost inevitably be the same as those of the predecessor. The absence of change therefore proves little. Because the fourth factor, common ownership, is not present and plaintiffs have failed to offer any other evidence of a sham transfer, their claim that HLC is HICS's alter ego fails as a matter of law.

Plaintiffs' reliance on the Ninth Circuit's dictum in *J.M. Tanaka* that common ownership "is not a necessary prerequisite to an alter ego finding," 675 F.2d at 1035, does not alter this analysis. Indeed, that case illustrates the deficiencies in plaintiffs' evidence. Eight percent of the J.M. Tanaka company was owned by Raymond Tanaka, its president; members of his family owned the remaining ninety-two percent. When J.M. Tanaka ceased operating, the R.M. Tanaka company, owned solely by Raymond Tanaka, hired most of J.M. Tanaka's former employees and began to conduct essentially the same operations. The court concluded that R.M. Tanaka was the alter ego of J.M. Tanaka and that R.M. Tanaka was bound by J.M. Tanaka's CBA, despite the absence of significant common ownership. *Id.* at 1035. The common family ownership, *id.,* as well as other circumstances, *see id.* at 1032–33, served as alter-

native indicators of a sham transaction. Plaintiff has failed to offer similar proof.

Plaintiffs have had a full opportunity to conduct discovery. A recent set of additional interrogatories filed by plaintiff would, if answered, produce nothing to change the underlying material facts and lend any support to plaintiffs' argument. They have come forward with no evidence which could sustain a finding of alter ego. No material facts are in dispute. It is clear therefore that defendant HICS and the individual defendants are entitled to judgment as a matter of law.

## II. *Claims Against HLC*

Because, as discussed above, HLC and HICS are not alter egos of one another, HLC can not be held liable for any actions taken by HICS. However, plaintiffs bring separate allegations against HLC, arguing that it breached the original CBA by 1) failing to give three days notice prior to termination; 2) closing its doors and thus making it difficult for plaintiffs to follow the CBA grievance procedures; 3) discontinuing health and welfare benefits; and 4) failing to provide work for senior employees pursuant to a letter of understanding contained in the CBA.

Defendant HLC moves for summary judgment on two separate and independent grounds: 1) plaintiffs failed to exhaust their contractual remedies; and 2) defendant did not breach the CBA.

### A. *Exhaustion of Contractual Remedies*

■ "As a general rule, employees must attempt to exhaust the grievance and arbitration procedures established by the bargaining agreement before seeking judicial enforcement of their rights." *Beriault v. Local 40, Super Cargoes & Check. of I.L. & W.U.*, 501 F.2d 258, 262, n. 3 (9th Cir. 1974). Only in two situations may an employee obtain judicial review of his breach of contract claim despite his failure to pursue contractual remedies: 1) when the employer has repudiated the grievance and arbitration procedures, *id.;* or 2) when the employee was prevented from exhausting by the union's breach of its duty of fair

representation. *Dutrisac v. Caterpillar Tractor Co.*, 749 F.2d 1270, 1274 (9th Cir. 1983).

■ Plaintiffs in the present case have not shown the existence of either of the above situations. First, even if defendant did breach the CBA by closing its doors without notice, it does not follow that it repudiated the grievance and arbitration procedures contained in the CBA. Defendant HLC's alleged breach of the CBA is precisely the type of grievance which should be pursued through the procedures of the CBA.

■ Second, the evidence offered by plaintiffs in support of their argument that the Union breached its duty of fair representation is legally insufficient. Plaintiffs allege that past misconduct by the Union representative at HLC discouraged them from seeking the Union's assistance after they were terminated by HLC. Plaintiffs, however, have cited no cases, and the Court has found none, which hold that past union misconduct excuses the failure to attempt to pursue the contractual remedy. Rather, plaintiffs are required to show that a contemporaneous union breach of duty prevented them from processing their grievance. *See id.*

■ To that end, plaintiffs argue that the closing of the local union office made the filing of a grievance virtually impossible. Ordinarily it would be a failure to process a grievance that would amount to a breach of the duty of fair representation and excuse an employee's failure to exhaust. *See, e.g., id.* If the union makes itself inaccessible, thereby precluding processing of a grievance, that too might excuse an employee from pursuing his contractual remedies. But the undisputed facts of this case preclude such a finding. While the local office of the Union may have been closed, plaintiffs' own evidence establishes that other offices were open and willing to respond to plaintiffs' inquiries and that the Union was in fact actively representing the employees in negotiating a new agreement.

Plaintiffs' justifications for not exhausting fail as a matter of law. HLC is therefore entitled to summary judgment on that ground.

### B. *Breach of the Collective Bargaining Agreement*

 The absence of a breach is an independent ground for granting the motion. Without specific terminology indicating otherwise, a collective bargaining agreement does not create an employer-employee relationship nor does it guarantee the continuance of one. *Fraser v. Magic Chef-Food Giant Markets, Inc.*, 324 F.2d 853, 856 (6th Cir.1963). "Employees' rights under such a contract do not survive a discontinuance of business and a termination of operations." *Id.*

Plaintiffs cite no provisions of the CBA which indicate that the collective bargaining agreement creates rights which extend beyond discontinuance of business and termination of operations. The Letter of Understanding, which plaintiffs argue does create such a right, reads as follows: "In the event of a general economic layoff, as a result of declining sales, all employees who were on the payroll on December 13, 1982, and whose seniority date is on or before December 31, 1972 shall be guaranteed work for the duration of this agreement."

This provision of the CBA can only be construed as a guarantee that senior employees will not be terminated "in the event of a general economic layoff as a result of declining sales." It does not guarantee that senior employees will be provided work in the event of discontinuance of business and termination of operations.

The CBA provisions guaranteeing Health and Welfare benefits and notice prior to termination likewise do not survive termination of operations by the employer.

Defendant HLC's legal obligation following termination of operations was limited to bargaining with the Union over the effects of the plant closure. *First National Maintenance Corp. v. NLRB*, 452 U.S. 666, 101 S.Ct. 2573, 69 L.Ed.2d 318 (1981). This obligation was fulfilled, as evidenced by the severance pay and grievance agreement entered into between HLC and the Union.

The material facts are undisputed. As a matter of law HLC did not breach the CBA.

### III. *Motion for Rule 11 Sanctions*

Defendant HICS moves for sanctions under Fed.R.Civ.P. 11, on the ground that plaintiffs' alter ego argument is not well grounded in fact or law. Plaintiffs' argument is based on a mechanical application of the test set forth in *J.M. Tanaka.* Although the Court disagrees with plaintiffs' position and finds that case distinguishable, plaintiffs' argument is not so wholly lacking in foundation that it merits sanction. The motion is denied.

For reasons stated, defendants' motions for summary judgment are granted.

IT IS SO ORDERED.