ALAN DESPRES vs. LABOR RELATIONS COMMISSION.

No. 87-87.

Suffolk.  November 13, 1987. — March 2, 1988.

Present: DREBEN, CUTTER, & FINE, JJ.

*Labor,* "Alter ego" doctrine.

Discussion of the "alter ego" doctrine and the criteria for its application in
   labor relations proceedings. [431-433]
No error appeared in a finding of the Labor Relations Commission that one
   enterprise was the alter ego of another for purposes of imposing joint
   and several liability on both entities to remedy certain unfair labor prac-
   tices and to comply with obligations under bargaining agreements, where
   evidence of substantial identity of management, business purpose, oper-
   ation, equipment, customers, supervision, and ownership of the enter-
   prises supported the conclusion that one entity was the disguised continu-
   ation of the other. [433-438]

APPEAL from an order of the Labor Relations Commission.
*Armand Fernandes, Jr.,* for the plaintiff.
*Margery Williams* for the defendant.

DREBEN, J. This is an appeal by Alan Despres from an order
of the Labor Relations Commission (commission) ruling that
he and his father, Arthur Despres, are jointly and severally
liable to remedy certain unfair labor practices and to comply
with obligations under collective bargaining agreements. Lia-
bility was imposed because the commission found that Alan's
unincorporated company, Advanced Advertising (Advanced),
is the alter ego of Arthur's former company, Adrian Advertising
(Adrian). Alan claims that the findings of the commission do
not support this conclusion.[1] We affirm the order of the com-
mission.

---

[1] Alan also argues that Advanced is not a "successor" to Adrian. We need
not discuss this issue since, contrary to Alan's assertion that the commission

Alan does not challenge the findings that his father engaged in unfair labor practices or that his father entered into binding collective bargaining agreements. Nor does he argue that the commission's subsidiary findings are not supported by substantial evidence. See G. L. c. 30A, § 14(7)(*e*).[2] The question before us is whether the subsidiary facts found by the commission, including the factual inferences drawn therefrom, support its ultimate finding that an alter ego relationship exists. See *Medi-Cab of Mass. Bay, Inc.* v. *Rate Setting Commn.*, 401 Mass. 357, 369 (1987) (reviewing court not empowered to draw different inferences from the facts found by the agency). See also *Southport Petroleum Co.* v. *NLRB*, 315 U.S. 100, 106 (1942).

Before turning to the facts found by the commission, we consider briefly the alter ego doctrine and the criteria for its application. The doctrine is one of several, not always neatly separable, principles developed by the NLRB to prevent employers from evading labor obligations[3] by changing the form of their business operations. When what appears to be a new company is, in reality, a "disguised continuance" of the old employer, *Southport Petroleum Co.* v. *NLRB*, 315 U.S. at 106, it is "appropriate to treat two nominally separate business

did not rule which of two labor law doctrines, "successor" or "alter ego," here applies, the commission, in the concluding part of its decision, ruled squarely that Advanced was the alter ego of Adrian. In a footnote, the commission explained that even if the record supported a conclusion that the two businesses were separate entities, the "successor" principle would make Alan liable for certain unfair labor practices of his father.

[2] Although the titles in his brief suggest otherwise, counsel acknowledged at oral argument that he was not making a G. L. c. 30A, § 14(7)(*e*), claim. Since the record of the entire proceedings is not before us, we, in any event, would be unable to decide whether there was substantial evidence to support the decision. Had Alan wanted to make a G. L. c. 30A, § 14(7)(*e*), claim, he could have designated the record of the entire proceedings. See G. L. c. 30A, § 14(4), and *Registrar of Motor Vehicles* v. *Board of Appeal on Motor Vehicle Liab. Policies & Bonds,* 382 Mass. 580, 590 (1981). Cf. *Lyons* v. *Labor Relations Commn.,* 19 Mass. App. Ct. 562, 565 (1985), *S.C.,* 397 Mass. 498 (1986) (disagreeing with another point).

[3] The policies of the Federal Act and of G. L. c. 150A have been said to be the same, *R.H. White Co.* v. *Murphy,* 310 Mass. 510, 515 (1942), and Federal labor precedents are routinely cited by both appellate courts in Massachusetts.

entities as if they were a single continuous employer." *NLRB* v. *Allcoast Transfer, Inc.*, 780 F.2d 576, 579 (6th Cir. 1986), quoting from *Alkire* v. *NLRB*, 716 F.2d 1014, 1018 (4th Cir. 1983). *Carpenters Local Union No. 1846* v. *Pratt-Farnsworth, Inc.*, 690 F.2d 489, 507 (5th Cir. 1982), cert. denied, 464 U.S. 932 (1983).

Criteria have been developed by the NLRB to determine whether an entity is an alter ego of another business. These are listed in *Crawford Door Sales Co.*, 226 N.L.R.B. 1144, 1144 (1976), and seem widely accepted. Alter ego status is usually found where there is a substantial identity of "management, business purpose, operation, equipment, customers, supervision and ownership." *NLRB* v. *Allcoast Transfer, Inc.*, 780 F.2d at 579. *NLRB* v. *Al Bryant, Inc.*, 711 F.2d 543, 553-554 (3d Cir. 1983), cert. denied, 464 U.S. 1039 (1984). *Fugazy Continental Corp.* v. *NLRB*, 725 F.2d 1416, 1419 (D.C. Cir. 1984). *Goodman Piping Prod., Inc.* v. *NLRB*, 741 F.2d 10, 12 (2d Cir. 1984).

Factors additional to those listed in *Crawford*, 226 N.L.R.B. at 1144, have also been held significant and sometimes even crucial. The Federal courts are not wholly in agreement on these criteria, and we have not found or been referred to any Massachusetts appellate court decisions discussing the alter ego principles applied by the N.L.R.B.

Alan would have us deem critical an "[u]nlawful motive or intent" by the employer as discussed in the First and Eighth Circuits. See *Penntech Papers, Inc.* v. *NLRB*, 706 F.2d 18, 24 (1st Cir.), cert. denied, 464 U.S. 892 (1983), and *Crest Tankers, Inc.* v. *National Maritime Union*, 796 F.2d 234, 237 (8th Cir. 1986) ("a critical part of the inquiry into alter ego status . . . is whether the employers acted out of anti-union sentiment or to avoid a labor contract").

Neither the NLRB, see *Crawford Door Sales*, 226 N.L.R.B. at 1144, nor the Supreme Court has insisted on an unlawful intent. See *Howard Johnson Co.* v. *Detroit Local Joint Executive Bd.*, 417 U.S. 249, 259 n.5 (1974). Other circuits have explicitly rejected unlawful motive as a strict prerequisite. *Goodman Piping Prod., Inc.* v. *NLRB*, 741 F.2d at 12 (2d

Cir.). *NLRB* v. *Allcoast Transfer, Inc.*, 780 F.2d at 581 (6th Cir.).

The commission urges us not to impose a rigid requirement. Although we have no doubt that an employer who "makes changes in its business operation [deliberately to] get rid of the union . . . is more likely to be an alter ego," *NLRB* v. *Tricor Prod., Inc.*, 636 F.2d 266, 270 (10th Cir. 1980), on the evidence in this case, we need not decide whether or to what extent proof of anti-union bias or evasive intent is an essential factor. Implicit in the commission's decision is a finding of anti-union animus on the part of both Alan and Arthur.

The National Labor Relations Board's broad jurisdiction removes from the commission's supervision most employers significantly engaged in interstate commerce. The commission, nevertheless, exercises supervision over some employers and union groups significantly larger than those involved in the present case. Neither the commission nor this court can now anticipate whether anti-union intent or some other additional factor must be taken into account in circumstances which may exist in different and perhaps more substantial controversies in which "alter ego" principles may be invoked. We leave for development by the commission, subject to judicial review, on a case by case basis, the factors of employer behavior which are appropriate to further the policies of G. L. c. 150A. See *NLRB* v. *Al Bryant, Inc.*, 711 F.2d at 552; *School Comm. of Boston* v. *Labor Relations Commn.*, 24 Mass. App. Ct. 721, 728 (1987). Cf. *Carpenters Local Union No. 1846* v. *Pratt-Farnsworth, Inc.*, 690 F.2d at 511. But see *J.M. Tanaka Constr., Inc.* v. *NLRB*, 675 F.2d 1029, 1033 (9th Cir. 1982) (no one factor controlling); *Goodman Piping Prod., Inc.* v. *NLRB*, 741 F.2d at 11 (analysis should be "flexible"); *NLRB* v. *Allcoast Transfer, Inc.*, 780 F.2d at 581-582 (total circumstances of each case should be examined).

Turning to the relevant facts found by the commission, we find no error in its conclusion that Alan's enterprise was the alter ego of Arthur's. Arthur purchased Adrian Advertising, a print shop, in April, 1981. Its prior owner had had a collective

bargaining agreement with Local 391, International Brotherhood of Painters and Allied Trades (union), covering David Richard (Richard), Adrian's sole employee at the time of sale. This affiliation with the union enabled Arthur's predecessor to obtain a union label agreement, a necessity for acquiring and keeping a politician-clientele. After his purchase, Arthur and the union entered into a new union label agreement and a "successorship" agreement which bound Arthur to honor the terms of the collective bargaining agreement signed by his predecessor. When Arthur began to operate Adrian, he had two employees: Richard, who had formerly been employed by Adrian; and Arthur's niece, Donna Souza (Souza), who worked on a part-time basis.

Approximately three months after acquiring Adrian, Arthur moved the print shop to a building Arthur owned and in which Alan operated another print shop, New Bedford Signcrafters, Inc. (Signcrafters). Signcrafters had originally been founded by Arthur in 1971. He transferred his stock to Alan in 1976 for one dollar, under a written agreement which provided that Arthur could continue to use Signcrafters' equipment and that such equipment would not be sold without his permission.

After the move, Alan gave Richard work assignments for both Signcrafters and Adrian, and Richard used Signcrafters' equipment for Adrian's customers. Alan's wife, Carol, answered the telephones of both shops and did their bookkeeping without being compensated by Arthur.

Because of poor business, Alan closed out Signcrafters in late 1982 and went to work for Adrian.[4] At Adrian, he assumed a managerial role. He supervised Richard, assigned him work, ordered materials, and dealt with union problems.

Matters with the union became tense in 1983. Adrian failed to give Richard benefits to which he was entitled under the collective bargaining agreement and also failed to require Souza to become a union member. During this period, Alan conducted most of the discussions with the union. He learned in June

---

[4] Alan was a member of the union from February 7, 1983, to June, 1983.

that his father wished to retire. In June, the union wrote Arthur and Alan revoking Adrian's right to use the union label.

On July 6, 1983, the union filed unfair labor practice charges against Adrian with the NLRB.[5] The union sent Alan and Arthur another letter in August, 1983, threatening to bring criminal charges against Adrian for persisting in using the union label without authorization. Another letter from the union demanded that Souza's employment be terminated for failure to pay union dues.

On September 13, 1983, Alan and the union's business manager agreed to revisions of the collective bargaining agreement. This was done, as Alan explained to the union representative, because Arthur was leaving the business and Alan was to be the sole owner of the company. The business manager sent Alan a letter dated September 13, setting forth the agreed terms.

At about that time, the union filed a second unfair labor practice charge with the NLRB and filed criminal charges in the New Bedford District Court, alleging fraudulent use of the label by Adrian.[6] Alan, enraged, told the union business manager on September 19, "You blew it. There's not going to be a union here. You blew it by filing that thing in court and at the Labor Board, and I'll see you in court."

On October 6, 1983, Arthur called a meeting of Alan, Richard, and Souza, and announced that he "had had it," that he was quitting, and was giving up the business. He fired Richard and Souza. Alan immediately told Richard and Souza that he was taking over and asked both of them to stay. They agreed to do so. Richard returned to the same project he had been working on before the meeting and continued doing the same work the next day.

---

[5] The charges were filed shortly after a dispute between Richard and Carol during which Richard said, "I quit." Adrian reinstated Richard without full back pay in early August after the union withdrew its charges from the NLRB.

[6] The commission made no finding whether either of the charges was filed prior to the September 13th meeting.

The next workday, Alan and Arthur arrived in court with counsel for a hearing on the union's criminal charges and saw Richard was there on behalf of the union.[7] When Richard returned to work,[8] Alan, upset, called Richard an obscene name, and told him, "You're crazy for going down there . . . . You're fired. Get out." The union by letter informed Arthur and Alan that Richard's firing was motivated by his union activity and hence violated the collective bargaining agreement and Federal labor laws. The union sought a meeting and also information relevant to other contract violations. Alan and Arthur failed to respond.

During October, Alan began using the name Advanced Advertising but continued to fill Adrian's backlog of orders and also continued to use its equipment and to use invoices imprinted with Adrian's name. Carol did the bookkeeping, and Arthur painted signs on an "as needed basis." When new invoices in the name of Advanced were printed in November, they bore a logo similar to Adrian's.

Alan attempted to retain Adrian's political clientele by obtaining a label from another union. Permission was revoked early in 1984 when the second union learned of Adrian's labor difficulties with Local 391 and few politicians remained customers of Advanced.

Charges of unfair labor practices were filed by the union with the commission in December, 1983. A complaint issued, and, after hearings, the commission reached the decision now on appeal.

The commission's findings, cast in terms of the factors listed in *Crawford Door Sales*, 226 N.L.R.B. at 1144, discussed earlier — substantial identity of management, business purpose, operation, equipment, customers, supervision and ownership — establish that Alan gradually assumed responsibility for Adrian's management, particularly its labor relations; see *J.M. Tanaka Constr., Inc.* v. *NLRB*, 675 F.2d at 1034; that the business purpose of Advanced was the same as Adrian's;

---

[7] No hearing was held although there was some discussion in chambers.

[8] The sign on the building still read "Adrian Advertising."

that both were print shops; that both operated in the same location with much the same equipment; that Advanced filled Adrian's backlog of customer orders; that the loss of political customers and the resulting difference in customer identity was caused by Adrian's wrongful use of the union label; see *Charles T. Reynolds, Sr.*, 139 N.L.R.B. 519, 524 (1962); that Alan had supervisory duties and had set the work assignments at both Adrian and Advanced.

Those findings provide strong support for the commission's conclusion that Advanced is the alter ego "or disguised continuation of Adrian Advertising." The commission was warranted in not finding the evidence concerning Advanced's ownership conclusive in Alan's favor.[9] See *Crawford Door Sales Co.*, 226 N.L.R.B. at 1144, where lack of identity of ownership did not preclude a determination of alter ego status, particularly since ownership remained in the family. See also *J.M. Tanaka Constr., Inc.* v. *NLRB*, 675 F.2d at 1034-35; *NLRB* v. *Campbell-Harris Elec., Inc.*, 719 F.2d 292, 296 (8th Cir. 1983); *Fugazy Continental Corp.* v. *NLRB*, 725 F.2d at 1420, cases holding that lack of identical ownership does not, in itself, prevent alter ego status. Contrary to Alan's contention, the cases he cites do not provide a small business exception.[10] Cf. G. L. 150A, § 3.

The commission held Arthur and Alan jointly and severally liable under the collective bargaining agreements and ordered them to remedy several unfair labor practices. Alan claims that he cannot be legally held to the terms of a collective bargaining agreement he never signed, even if he is found to be an alter ego employer. Alan confuses the remedies available against an entity found to be a successor with those available against

---

[9] In addition to the legal conclusion that ownership alone is not determinative of the alter ego question, there was evidence before the commission that after Alan took over the business, the older generation continued to receive benefits. In October, 1983, Advanced began making payments of $175.00 per week to Arthur's wife (Alan's mother). The nature of these payments was not made clear, although Alan claimed they were rent.

[10] *Universal Elec. Co.*, 227 N.L.R.B. 1790, 1793-1794 (1977). *T.E. Elevator Corp.*, 268 N.L.R.B. 1461, 1461 (1984). *Hillsamer Painting Contractors, Inc.*, 272 N.L.R.B. 1366 (1984).

one having alter ego status. A successor with knowledge of its predecessor's unfair labor practices may be held liable for such practices, but it may not, without more, be held bound by the terms of its predecessor's collective bargaining agreements. *Golden State Bottling Co.* v. *NLRB*, 414 U.S. 168, 184-187 (1973). In contrast, an entity properly deemed to have alter ego status may be held responsible for both the unfair labor practices and the collective bargaining agreements of its predecessor. *NLRB* v. *Tricor Prod., Inc.*, 636 F.2d at 269-270. *Carpenters Local Union No. 1846* v. *Pratt-Farnsworth, Inc.*, 690 F.2d at 507. *NLRB* v. *Campbell-Harris Elec., Inc.*, 719 F.2d at 295. *NLRB* v. *Amateyus, Ltd.*, 817 F.2d 996, 998 (2d Cir. 1987). See *Howard Johnson Co.* v. *Detroit Local Joint Executive Bd.*, 417 U.S. at 259 n.5. Moreover, Alan, to a large extent, is being held liable for actions which were solely his. He was the one who repudiated the agreement he had negotiated with the union in preparation for his taking over the business, and he was the one who fired Richard after the takeover.

In sum, we conclude that the ultimate finding of alter ego status and the imposition of joint and several liability on Alan were warranted.

*Order of the Labor Relations*
*Commission affirmed.*