CENTRAL STATES, SOUTHEAST AND SOUTHWEST AREAS PENSION FUND and Howard McDougall, trustee, Plaintiffs,

v.

David SLOAN (a/k/a Dave Sloan), individually d/b/a Sloan Excavating and d/b/a Dave Sloan Excavating, and Darlene Sloan, individually d/b/a Sloan Enterprises, Defendants.

No. 88 C 6316.

United States District Court, N.D. Illinois, E.D.

May 31, 1989.

---

Albert M. Madden, Thomas C. Nyhan and Constance M. Borek, Central States Pension Fund, Chicago, Ill., for plaintiffs.

Jack C. Vieley, Peoria, Ill., for defendants.

## MEMORANDUM OPINION AND ORDER

ASPEN, District Judge:

The plaintiffs, the Central States, Southeast and Southwest Areas Pension Fund and one of its trustees Howard McDougall (collectively "Central States"), have sued to recover delinquent pension contributions from David Sloan, d/b/a Sloan Excavating, and Darlene Sloan, d/b/a Sloan Enterprises. Currently before the Court is Central States' motion for summary judgment. For the reasons set forth below, that motion is granted.

### Facts

The parties do not dispute most of the evidence here, but they do dispute the inferences to be drawn from that evidence. They agree that David Sloan has operated Sloan Excavating ("Excavating") in the Bloomington, Illinois, area for the last fourteen years. As part of that business, he has used trucks and employed drivers to haul rock, gravel and concrete. In February 1987, Excavating executed both a preexisting area-wide collective bargaining agreement and a participation agreement with Local 26 of the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America ("Team-

sters"). Under these agreements, Excavating agreed to pay pension contributions to Central States on behalf of Excavating's three covered drivers, amounting to $61 a week for each employee. Soon after signing these agreements, however, David Sloan found that he "couldn't stay in business under that contract." David Sloan Dep. at 30, attached as Exh. D, Central States' Local Rule 12(1) Statement.[1] Accordingly, in May 1987, he essentially transferred the hauling and trucking part of his business to a new company formed by his wife Darlene Sloan and known as Sloan Enterprises ("Enterprises"). With only two exceptions,[2] neither Enterprises nor Excavating has remitted any further pension contributions.

The relationship between Enterprises and Excavating forms the crux of this case. Central States contends that Enterprises is the alter ego of Excavating and as such remains liable for the pension fund contributions, while the Sloans argue that Excavating and Enterprises are really two separate entities, and that Enterprises therefore has no obligation to Central States. Because of the importance of this dispute, it is necessary to examine the creation of Enterprises and its relation to the ostensibly separate Excavating.

On May 31, 1987, Excavating's three truck drivers stopped working for Excavating, *see* Answers to Interrogatories ¶ 7, Exh. I, and began working for Enterprises, *see* Darlene Sloan Response to Request for Admissions ¶¶ 14, 16; Dep. of James Bridgewater at 10, Exh. K. In addition, Excavating transferred all four of its trucks to Enterprises free of charge. *See* Darlene Sloan Dep. at 8, Exh. C; David Sloan Dep. at 9, Exh. D. Ever since the transfer of employees and trucks, the two entities have had separate offices and truck sheds, but they are relatively close together. Specifically, their offices are about 120 feet apart; Enterprises' office is in a room at the Sloan's home, while Excavating's office is in the shop behind the house.

David Sloan Dep. at 40–41, Exh. D. Likewise, the trucks used by Enterprises and the equipment used by Excavating are kept in separate parts of the same building. *Id.* at 59–59.

The two entities have separate telephone numbers, see David Sloan Dep. at 41, Exh. D, advertise separately, *id.* at 42; Darlene Sloan Dep. at 34–35, Exh. C, bill separately, *id.* at 34, and maintain separate books and records, *id.* at 42. However, there are financial relations between the two. First, from June to September 1987, Enterprises used Excavating's checking account to pay the wages of its truck drivers, although the money came from Enterprises' funds. *See id.* at 8–9. In addition, BancMidwest made two loans to Excavating after the transfer of trucks and employees from Excavating. Each loan listed the borrowers as "David L. Sloan/Cara Darlene Sloan [her full name] d/b/a David Sloan Excavating"; each loan was signed by both David and Darlene Sloan; and each loan was secured by one of the trucks transferred from Excavating to Enterprises. *See* Exhibits 1 and 2 to Dep. of Karen Fincham, Exh. M. Darlene Sloan indicated that Excavating is paying one of these loans, even though Enterprises is using the truck which secures the loan. Darlene Sloan Dep. at 30. (The parties have not pointed to any evidence concerning the second loan.) Moreover, in a personal financial statement submitted in connection with the loan, David Sloan listed the four trucks used by Enterprises, as well as the equipment used by Excavating, as personal assets. Exhibit 3 to Dep. of Karen Fincham, Exh. M.

Excavating remained in the excavation business after it transferred its trucking business to Enterprises. When Excavating needed truckers in its work, David Sloan would hire Enterprises' truck drivers, just as any other contractor might. If Enterprises had equipment available, it would do the work for Excavating and then bill Excavating at the same rate as other contrac-

1. Hereafter, we will use "Exh." to refer to the exhibits accompanying Central States' Local Rule 12(1) Statement.

2. *See* Affidavit of James Ingraham at 5, Exh. D. It is not clear who made these two contributions.

tors for the service rendered. Dep. of Darlene Sloan at 37, Exh. C; Dep. of David Sloan at 64, Exh. D. Enterprises' truck drivers reported to Darlene Sloan, and she would give them their assignments. Dep. of Darlene Sloan at 13, Exh. C. They would also report to the contractor who hired Enterprises, whether that was David Sloan or someone else. *Id.* at 14; David Sloan Dep. at 23–25, Exh. D. David Sloan did not otherwise direct the activities of Enterprises' employees. *Id.* at 62.

Initially, about forty to forty-five percent of Enterprises' work was done for Excavating. Darlene Sloan Dep. at 21, Exh. C. Shortly thereafter, the percentage began to decrease and now stands at ten to fifteen percent. *Id.* at 37.

### Summary Judgment

Under the Federal Rules of Civil Procedure, summary judgment is appropriate if "there is no genuine issue as to any material facts and ... the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). This standard places the initial burden on the moving party to identify "those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986) (quoting Rule 56(c)). Once the moving party has done this, the non-moving party "must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita Electric Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986) (quoting Rule 56(e)).

### The Alter Ego Doctrine

To determine whether a genuine issue of material fact is present, "we must consider both the substantive law applicable to this case and the question of whether a reasonable jury could render a verdict in favor of the non-moving party based upon this law." *Checkers, Simon & Rosner v. Lurie Corp.,* 864 F.2d 1338, 1344 (7th Cir.1988). Central States assumes that the substantive law applicable to this case is the alter ego doctrine. This doctrine is usually applied to determine whether one employer is required to bargain with a union that represented a former employer's employees or whether that employer is bound by an arbitration decision against the former employer. *See International Union of Operating Engineers, Local 150 v. Centor Contractors, Inc.,* 831 F.2d 1309, 1313 (7th Cir.1987). However, we see no reason the same principles should not be applicable when a party seeks to enforce the terms of a labor contract, and the Sloans' do not argue otherwise.

The intent to avoid labor obligations is the linchpin of the alter ego doctrine, at least in the Seventh Circuit:[3]

> [T]he alter ego doctrine focuses on "the existence of a disguised continuance of a former business entity or an attempt to avoid the obligations of a collective bargaining agreement, such as through a sham transfer of assets." *Penntech Papers, Inc. v. NLRB,* 706 F.2d 18, 24 (1st Cir.1983). In sum "'[un]lawful motive or intent are critical inquiries in an alter ego analysis....'" *Iowa Express Distribution, Inc. v. NLRB,* 739 F.2d 1305, 1311 (8th Cir.1984) (quoting *Penntech Papers,* 706 F.2d at 24).

*Centor Contractors,* 831 F.2d at 1312–13.

In both his deposition and the response to the motion for summary judgment, David Sloan has forthrightly admitted that he transferred Excavating's trucking business to Enterprises because he believed Excavating's labor obligations threatened its continued survival. The cost of Excavating's labor obligations made Excavating less competitive with other, non-union con-

---

**3.** Some circuits have concluded that intent to avoid labor obligations is not a necessary element for liability as an alter ego, although such an intent is relevant to the inquiry. *See, e.g.,* *N.L.R.B. v. Allcoast Transfer, Inc.,* 780 F.2d 576, 579–81 (6th Cir.1986) (discussing cases); *Goodman Piping Products, Inc. v. N.L.R.B.,* 741 F.2d 10, 12 (2d Cir.1984).

tractors, David Sloan Dep. at 10; *see also* Darlene Sloan Dep. at 7. David Sloan found that he "could not afford to stay in business the way things were going," David Sloan Dep. at 29. He concluded that transfer was the only way to avoid Excavating's labor obligations and to save Excavating's business. As stated in Defendants' Counterstatement of Material Facts,

> The most fundamental and bona fide of economic motives underlay David Sloan's decision to get his company, Sloan Excavating ("Excavating"), out of the trucking and hauling business: Excavating could not survive if its trucking and hauling functions continued to operate under the collective bargaining agreement and participating agreement . . .

> Transfer of Excavating's trucking and hauling business to a new company not bound by the agreements was seen as the means to Excavating's survival. . . .

By the Sloans' own admission, then, David Sloan transferred Excavating's trucking business in order to avoid its labor obligation. Although motivated by a desire to save Excavating's business and the jobs of its drivers, a matter that we discuss below, the Sloans admittedly intended to avoid Excavating's labor obligations.

▪ The case law is not completely clear on on this point, but it appears that the Sloans' intent, by itself, is enough to justify a finding that Enterprises is Excavating's alter ego. In the one Seventh Circuit opinion on the alter ego doctrine, there were other factors present, which the Court discussed in considering the successorship doctrine.[4] *Centor Contractors*, 831 F.2d at 1313. However, in holding that one defendant was the alter ego of another, the Seventh Circuit focused only on the defendants' intent to avoid their obligations to the union. *Id.* at 1314. The Court's discussion of the alter ego doctrine seems to indicate that such an intent is enough.

▪ But even if our reading of *Centor Contractors* is mistaken, there are other factors present in this case to support the application of the alter ego doctrine. For example, Excavating's three truck drivers all went to work for Enterprises. Enterprises and Excavating both used the same checking account, at least for a time; their offices, although separate, are located on the same property. Excavating transferred its trucks to Enterprises free of charge. Perhaps most tellingly, Excavating used two of the trucks transferred to Enterprises as collateral for loans and is paying off at least one of those loans. To be sure, Excavating and Enterprises are not completely identical. They now maintain separate checking accounts, bill and advertise separately and maintain separate books and records. Moreover, Enterprises bills Excavating for the services it performs. But these factors evidence a mere formal change in operations and are greatly outweighed by the other factors and especially by the Sloans' admitted intent to avoid Excavating's labor obligations. In short, there is, to use the Supreme Court's phrase, no more than a "metaphysical doubt" that Enterprises was and is the alter ego of Excavating. *See Matsushita Electric Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed. 2d 538 (1986). The record, taken as a whole, "could not lead a rational trier of fact to find for" the Sloans; thus, there is no genuine issue for trial, and summary judgment is appropriate. *See id.* at 587, 106 S.Ct. at 1356.

▪ The Sloans contend, however, that the agreements with the Teamsters threatened Excavating's survival and the jobs of the three covered drivers. They appear to imply that a transfer to avoid labor obligations is permissible if motivated by a desire to save the company and the jobs of its employees. We cannot agree. Under

---

**4.** Under the successorship doctrine, a successor employer may be liable for its predecessor's labor obligations, depending on a rather fluid set of factors, even if the transfer of business was bona fide and not activated by an intent to evade labor obligations. *See Centor Contrac-* *tors*, 831 F.2d at 1312. Central States has not relied on the successorship doctrine, and we do not discuss it here. At any rate, given our resolution of the alter ego issue, such a discussion would be unnecessary.

section 8(d) of the National Labor Management Relations Act, neither party to a collective bargaining agreement may modify the agreement, unless certain procedural requirements are met; these requirements include written notice to and an offer to negotiate with the other side. 29 U.S.C. § 158(d) (1982). Relying on this language, the Seventh Circuit has upheld the National Labor Relations Board's decision that an employer may not unilaterally reduce the wage rate under a collective bargaining agreement, even if the agreement threatens to bankrupt the employer. *N.L.R.B. v. Manley Truck Line, Inc.*, 779 F.2d 1327, 1331 (7th Cir.1985). Likewise, the Board has held that an employer's financial difficulties, which later resulted in bankruptcy, did not justify the unilateral suspension of payments to a pension fund. *Hiysota Fuel Co.*, 280 N.L.R.B. 763, 770 (1986). These cases reflect Congress' desire that parties not modify a collective bargaining agreement in mid-stream without following specified procedures, procedures that apply despite the threat of bankruptcy. We see no reason why an employer should be able to evade this policy by the transfer of assets to an alter ego.

## Injunctive Relief

█ Central States also seeks a permanent injunction requiring timely payment of pension contributions in the future. Under section 502(a)(3) of ERISA, a fiduciary such as Central States trustee McDougall, the other plaintiff in the case, may sue to enjoin "any act or practice which violates any provision of [subchapter I of ERISA] or the terms of the plan," 29 U.S.C. § 1132(a) (1982). Section 515 of ERISA adds the force of federal law to the general requirements of contract law and requires an employer to make pension contributions to which he has agreed under a collective bargaining agreement. *Id.* § 1145. Thus, the Sloans' failure to make contributions to Central States on behalf of the covered drivers is a violation of subchapter I of ERISA as well as of the plan itself. Relying on a Sixth Circuit case, *Laborers Fringe Benefit Funds—Detroit and Vicinity v. Northwest Concrete Construction, Inc.*, 640 F.2d 1350, 1353 (6th Cir. 1981), Central States argues that injunctive relief is appropriate under section 502(a)(3) because of the Sloans' violation of section 515.

However, as Central States recognizes, even where a statute authorizes injunctive relief, the party seeking such relief must show more than a mere violation of the statute. As the Supreme Court has held, the basis for injunctive relief " 'in the federal courts has always been irreparable harm and inadequacy of legal remedies,' " *Rondeau v. Mosinee Paper Corp.*, 422 U.S. 49, 57, 95 S.Ct. 2069, 2075, 45 L.Ed.2d 12 (1975) (quoting *Beacon Theatres, Inc. v. Westover*, 359 U.S. 500, 506–07, 79 S.Ct. 948, 954, 3 L.Ed.2d 988 (1959)), and Central States has not established that it will be irreparably harmed if the Sloans fail to make required contributions in the future. While it is true that Central States is required to pay benefits even if employers do not make contributions, *see Central States, Southeast and Southwest Areas Pension Fund v. Central Transport, Inc.*, 472 U.S. 559, 567 n. 7, 105 S.Ct. 2833, 2383 n. 7, 86 L.Ed.2d 447 (1985), monetary loss is not the type of irreparable injury remedied by injunctive relief. *Proimos v. Fair Automotive Repair, Inc.*, 808 F.2d 1273, 1277 (7th Cir.1987). (There may be some exceptions, *see Roland Machinery Co. v. Dresser Industries, Inc.*, 749 F.2d 380, 386 (7th Cir. 1984), but Central States has not argued they apply.) We conclude that injunctive relief is not appropriate here.[5]

---

**5.** We note that even if we issued an injunction, its effect might only be short-lived. Under the participation agreement, Excavating, and now Enterprises, must make pension fund contributions until they notify Central States that they have no legal duty to do so. *See* Participation Agreement ¶ 7, Exh. A. It appears that the Sloans may no longer have a legal duty to make contributions under the collective bargaining agreement. The collective bargaining agreement, entered into by the Associated General Contractors of Illinois and the Illinois Conference of Teamsters, and later adopted by Excavating, was scheduled to expire on April 30, 1989. *See* Collective Bargaining Agreement Art. 30, Exh. A. If the Contractors association and the Teamsters have entered into a new contract, the Sloans would not be bound by that contract

Damages

In an action to recover unpaid pension fund contributions, ERISA section 502(g)(2) directs us to award the unpaid contributions, plus either double interest or single interest plus the amount of liquidated damages specified by the plan. 29 U.S.C. § 1132(g)(2) (1982). The Central States Pension Fund Agreement specifies liquidated damages equal to twenty percent of the unpaid contributions, the maximum allowed by law. *See id* § 1132(g)(2)(C)(ii). In the present case, single interest plus liquidated damages exceeds double interest, and so we will award single interest plus liquidated damages.

The Sloans have not contested the amounts due. However, the amount that Central States requests as unpaid contributions does not jibe with its affidavit showing the breakdown of amounts due. *See* Affidavit of James Ingraham at 5. We will award the amount provided in the breakdown, $12,068.72, which is slightly lower and appears to be correct. We will also award interest in the amount of $1,270.54 plus liquidated damages in the amount of $2,413.74, totaling $15,753.00.

Conclusion

For the reasons set forth above, summary judgment is entered in favor of Central States to the extent it seeks legal relief. Central States' request for a permanent injunction is denied. The defendants are ordered to pay Central States $12,068.72 in unpaid contributions, $1,270.54 in interest and $2,413.74 in liquidated damages, for a total of $15,753.00. It is so ordered.

unless they choose to be or unless they have previously shown an unequivocal intent to be bound in collective bargaining by the Contractor association. *See Ruan Transport Corp.*, 234 N.L.R.B. 241, 242 (1978); 4 T. Kheel, *Labor Law* § 14.04[4] at 14–96 (1987). Presumably, the

Sloans would not choose to be bound by a new collective bargaining agreement and its pension fund obligations; the record does not reveal whether they intended to be bound by the actions of the Contractors association.