902 F.2d 593
 12 Employee Benefits Ca 1588
 CENTRAL STATES, SOUTHEAST AND SOUTHWEST AREAS PENSION FUND,
and Howard McDougall, Trustee, Plaintiffs-Appellees,
v.
David SLOAN (a/k/a Dave Sloan), individually d/b/a Sloan
Excavating and d/b/a Dave Sloan Excavating, and
Darlene Sloan, individually d/b/a Sloan
Enterprises, Defendants-Appellants.
 No. 89-2355.
 United States Court of Appeals,
Seventh Circuit.
 Argued Jan. 23, 1990.
Decided May 16, 1990.
As Amended June 4, 1990.
 
 Thomas C. Nyhan, Albert M. Madden, and Constance M. Borek, Cent. States, Southeast & Southwest Areas Pension Fund, Rosemont, Ill., for plaintiffs-appellees.
 Jack C. Vieley, Peoria, Ill., for defendants-appellants.
 Before POSNER, COFFEY and MANION, Circuit Judges.
 COFFEY, Circuit Judge.
 
 
 1
 David Sloan and Darlene Sloan appeal from an order granting summary judgment in favor of plaintiffs, Central States, Southeast and Southwest Areas Pension Fund (Pension Fund) and Howard McDougall, pension fund trustee. 714 F.Supp. 943. The district court held that the Sloans were liable to the plaintiffs under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. Sec. 1001 et seq. for delinquent pension contributions for those employees of Sloan Enterprises, an unincorporated business Darlene Sloan owned, that had formerly been employees of Sloan Excavating, an unincorporated business owned by her husband and co-defendant, David Sloan.[1] We affirm.
 
 I.
 
 2
 Since 1974 David Sloan has operated Sloan Excavating, an unincorporated business entity that excavates foundations, driveways and septic systems in the Bloomington, Illinois, area. Prior to May 31, 1987, Sloan Excavating owned four trucks and employed three truck drivers who hauled gravel, concrete and rock. In February of 1987, Sloan Excavating executed a collective bargaining agreement with Local 26 of the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America ("Teamsters") that applied to the three truck drivers. Under the terms of this collective bargaining agreement, Sloan Excavating was to pay contributions to the Pension Fund of $61 per week on behalf of each of the three covered drivers.[2] Sloan Excavating also entered a "participation agreement" with the Union in which it reiterated its obligation to pay contributions to the Pension Fund and further covenanted to be bound by the provisions of the trust agreement which created the Pension Fund and the rules of the Pension Fund's trustees adopted thereunder.
 
 
 3
 Within months of executing the collective bargaining agreement, David Sloan decided that he "couldn't stay in business under that contract." In his opinion, the union contract prevented him from being able to make competitive bids for residential work. David Sloan decided that he "was going to have to cancel the contract to stay in business." He attempted to persuade the Teamsters to cancel the contract, but the Union refused.
 
 
 4
 As a result of the Teamsters' refusal to allow him to cancel the contract, David and his wife, Darlene Sloan, decided that Darlene would begin to operate a non-union entity, known as Sloan Enterprises, and would take over Sloan Excavating's hauling operations. The creation of Sloan Enterprises was specifically motivated by David Sloan's desire to avoid his obligations under the union contract.[3] Sloan Excavating transferred all four of its trucks to Sloan Enterprises without any consideration in return.[4] On May 31, 1987, Sloan Excavating's three drivers ceased to be employed by Sloan Excavating, and began to be employed by Sloan Enterprises. With the exception of two payments,[5] no contributions to the Pension Fund were made on behalf of these employees for work performed after May 31, 1987.
 
 
 5
 The Sloans made some attempts to separate the operations of Sloan Enterprises and Sloan Excavating. Sloan Excavating maintained its office in a shed behind the Sloans' personal residence, while Sloan Enterprises' office was in the Sloans' residence. Sloan Enterprises billed Sloan Excavating at the same rates it charged other trucking customers. Darlene Sloan gave Sloan Enterprises' drivers their assignments, except when they were on a job for a specific customer. The two companies maintained separate financial records, telephone listings and advertising.
 
 
 6
 Many of the operations of the two companies revealed their close financial relationship. Most obviously, David and Darlene Sloan, the owners of the respective companies, continued their marital relationship, including their joint tenancy of the real property where both Sloan Excavating and Sloan Enterprises' operations were based. Sloan Enterprises' trucks and Sloan Excavating's equipment were kept in separate areas of a building on the Sloan premises. In addition, from June to September 1987 Sloan Enterprises kept funds in Sloan Excavating's checking account and paid its employees' wages from this account. Furthermore, two bank loans were received in the names of "David L. Sloan/Cara Darlene Sloan d/b/a David Sloan Excavating." The loan agreements were signed by both Sloans and were secured with one of the trucks that had been transferred to Sloan Enterprises. Significantly, David Sloan's financial statement filed in connection with these loans listed the four trucks allegedly transferred to his wife's business as personal assets.
 
 
 7
 Following Sloan Excavating's transfer of its trucks to Sloan Enterprises, Sloan Excavating hired Sloan Enterprises to perform some of its hauling work. Initially, about 45 percent of Sloan Enterprises' total work was performed for Sloan Excavating, but that percentage had decreased to about 10 to 15 percent at the time discovery was conducted in the district court on this lawsuit. Sloan Enterprises' performance of work for customers other than Sloan Excavating was a change in the trucking operation as Sloan Excavating had not performed work for outside customers when it had conducted the trucking operation.
 
 
 8
 On July 22, 1988, the plaintiffs filed this action to recover delinquent contributions under Sections 502(g)(2) and 515 of ERISA, 29 U.S.C. Secs. 1132(g)(2) and 1145. The plaintiffs moved for summary judgment on February 17, 1989. The district court entered summary judgment in favor of the plaintiffs, holding that Sloan Enterprises was an alter ego of Sloan Excavating's trucking operation and, thus, was liable to pay the delinquent pension contributions for those Sloan Enterprises truck drivers that had formerly been employed by Sloan Excavating. The district court ordered the defendants to pay the Pension Fund $12,068.72 in unpaid pension contributions, $1,270.54 in interest and $2,413.74 in liquidated damages.
 
 II.
 
 9
 Our review of an order granting summary judgment is de novo. Schroeder v. Copley Newspapers, 879 F.2d 266, 268 (7th Cir.1989). Summary judgment is proper where no genuine issues of material fact exist and the moving party is entitled to judgment as a matter of law. Id. "In determining whether a genuine issue of material fact is present we must consider both the substantive law applicable to this case and the question of whether a reasonable jury could render a verdict in favor of the non-moving party based upon this law." Checkers, Simon & Rosner v. Lurie Corp., 864 F.2d 1338, 1344 (7th Cir.1988) (footnote omitted). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986).
 
 
 10
 The decisive question in our review of the district court's entry of summary judgment in favor of the plaintiffs is whether the district court properly determined that Sloan Enterprises is an "alter ego" of Sloan Excavating, thereby obligated to honor the pension contribution terms of the collective bargaining agreement entered into between Sloan Excavating and the Teamsters. See Penntech Papers, Inc. v. NLRB, 706 F.2d 18, 24 (1st Cir.1983) (An "alter ego finding ... will bind a non-signatory to a collective bargaining agreement....").
 
 
 11
 In International Union of Operating Engineers, Local 150 v. Centor Contractors, Inc., 831 F.2d 1309, 1312 (7th Cir.1987), we noted that "the alter ego doctrine focuses on 'the existence of a disguised continuance of a former business entity or an attempt to avoid the obligations of a collective bargaining agreement, such as through a sham transfer of assets.' " (quoting Penntech Papers, 706 F.2d at 24). As we observed in NLRB v. Dane County Dairy, 795 F.2d 1313, 1321 (7th Cir.1986):
 
 
 12
 "The alter ego doctrine (i.e., treating two nominally separate business entities as if they were a single, continuous employer) is applied to 'prevent[ ] an Employer from gaining an unearned advantage in his labor activities simply by altering his corporate form....' Alkire v. NLRB, 716 F.2d 1014, 1018 (4th Cir.1983).
 
 
 13
 'The National Labor Relations Board has [found] an alter ego relationship where the new employer is a "disguised continuance of the old employer" ...; or was in active concert or participation in a scheme or plan of evasion ...; or siphoned off assets for the purpose of rendering insolvent and frustrating a monetary obligation such as back pay ...; or so integrated or intermingled its assets and affairs that "no distinct corporate lines are maintained." The Board has also found an alter ego relationship based on substantially identical business purposes, equipment, type of customers, actual joint day-to-day operations, joint labor relations, a favorable lease agreement, and the transient nature of the relationships between the companies. In some instances the criteria have been equated with the "basic indicia for finding a single employer, i.e., interrelation of operations, centralized control of labor relations, common management, and common ownership or financial control" although "more must be shown to establish that one organization is the alter ego of another." We have also found an alter ego relationship to exist "even though no evidence of actual common ownership was present." '
 
 
 14
 District 23, United Mine Workers of America (Kentucky Lake Dock Co.), 271 NLRB 461 (1984) (citations omitted)."
 
 
 15
 "Neither the courts nor the National Labor Relations Board have limited the alter ego analysis to those fact patterns where the original employer has disappeared entirely.... To limit the doctrine's applicability to companies which have shut down entirely would allow anti-union employers a complete escape from alter ego liability, simply by keeping a small aspect of the predecessor operation alive." Crest Tankers, Inc. v. National Maritime Union, 796 F.2d 234, 238 (8th Cir.1986).
 
 
 16
 In applying an "alter ego" analysis to the Sloans' attempt to transfer Sloan Excavating's unionized trucking operation to Sloan Enterprises, it is clear that David Sloan's motivation in transferring the trucking enterprise was his desire to avoid Sloan Excavating's obligations under the collective bargaining agreement with the Teamsters. Furthermore, instead of participating in an arms-length transaction with an unrelated individual or business entity, David Sloan and his wife Darlene agreed that Darlene would take over the trucking operation. The ownership of the four trucks was transferred from Sloan Excavating (David Sloan) to Sloan Enterprises (Darlene Sloan) without a dollar changing hands. Thus, it would appear that the creation of Sloan Enterprises was " 'an attempt to avoid the obligations of a collective bargaining agreement ... through a sham transfer of assets.' "[6] thus providing a clear foundation for a holding of "alter ego" status. Sloan Enterprises' role as an "alter ego" for the former trucking operations of Sloan Excavating is also reflected in the relationship between the two businesses after the transfer. Darlene and David Sloan continued their personal relationship as husband and wife. See Dane County Dairy, 795 F.2d at 1322; J.M. Tanaka v. NLRB, 675 F.2d 1029, 1034 (9th Cir.1982) (relying in part upon ownership of businesses by members of the same family in holding that the businesses were "alter egos"). The offices of the two business entities were only about 120 feet apart, on the same property, with a room in the Sloan's home constituting the office of newly created Sloan Enterprises and a shop behind the home containing the offices of Sloan Excavating. Both Sloan Enterprises and Sloan Excavating kept their equipment in separate areas of a single building on property Darlene and David Sloan owned as joint tenants. Although the businesses maintained separate telephone numbers, billing operations, books and records, they also maintained certain close financial ties that belied their ostensible separation. From June to September 1987 Sloan Enterprises kept funds in Sloan Excavating's checking account and paid its employees' wages from this account. In addition, two bank loans were received in the names of "David L. Sloan/Cara Darlene Sloan d/b/a David Sloan Excavating" that were signed by both Sloans and that were secured with one of the trucks that had been transferred from Sloan Excavating to Sloan Enterprises. In addition, David Sloan's financial statements filed in connection with the loans listed the four trucks allegedly transferred to his wife's business as personal assets. The combination of these facts clearly demonstrates " 'a disguised continuation of a former business entity' "[7] and require a conclusion that Sloan Enterprises is the "alter ego" of Sloan Excavating's former trucking operation.
 
 
 17
 The Sloans contend that Sloan Enterprises should not be held the "alter ego" of Sloan Excavating's trucking business because David Sloan did not continue to exercise control over the trucking operation after it was transferred. They assert that Sloan Excavating was merely a customer of Sloan Enterprises which paid for trucking services in the same way as any other customer. They further point out that while work for Sloan Excavating originally constituted 40 to 45 percent of Sloan Enterprises' business, it now constitutes only 10 to 15 percent of its operation. They go on to note that Sloan Enterprises has never made a payment to David Sloan and that Darlene Sloan does not consult David Sloan in making business decisions regarding Sloan Enterprises. Although these facts demonstrate that Sloan Enterprises had become increasingly independent and diversified since its founding, in light of the convincing facts demonstrating "alter ego" status, we do not believe that these facts alone are sufficient for a finder of fact to conclude that the businesses are not "alter egos." See J.M. Tanaka Construction, Inc. v. NLRB, 675 F.2d 1029, 1034 (9th Cir.1982) (differences in businesses since a takeover were insufficient to overcome "the evidence of interrelation of operations"). As mentioned previously, the creation of Sloan Enterprises was the product of a "sham transfer" designed to evade Sloan Excavating's obligations under its collective bargaining agreement with the Teamsters. This fact, combined with the interrelationship between the two businesses since the time that Sloan Enterprises was created, including the location of both businesses' offices on property the Sloans owned, storage of equipment in the same building on this property, temporary use of Sloan Excavating's checking account for payment of Sloan Enterprises' employees and utilization of a Sloan Enterprises truck as security for a loan to Sloan Excavating, clearly establishes an "alter ego" status that, in our view, is not overcome by the alleged subsequent diversification of Sloan Enterprises' trucking business. "Federal labor policy cannot tolerate such easy avoidance of collective bargaining obligations." Centor Contractors, 831 F.2d at 1314 (footnote omitted).
 
 
 18
 The Sloans also appeal the district court's award of attorneys' fees, interest and costs to the plaintiffs under Section 502(g)(2)(B) and (D) of ERISA, 29 U.S.C. Sec. 1132(g)(2)(B) and (D). However, this appeal was based solely on the ground that the district court's decision on the "alter ego" issue should be reversed. Because we agree with the finding of the trial judge that Sloan Enterprises was the "alter ego" of Sloan Excavating's trucking operation and the Sloans have urged no other basis for denying or modifying the award of attorneys' fees, we refuse to disturb the district court's award of costs, attorneys' fees and interest.
 
 
 19
 Thus, the judgment of the district court is AFFIRMED.
 
 
 
 [1]
 The Sloans also appeal the district court's order granting costs, attorneys' fees and interest to the plaintiffs under Section 502(g)(2)(B) and (D) of ERISA, 29 U.S.C. Sec. 1132(g)(2)(B) and (D)
 
 
 [2]
 Specifically, the collective bargaining agreement provided as follows:
 "Effective May 1, 1986, the Employer shall contribute to the Central States Southeast and Southwest Areas Pension Fund the sum of sixty-one dollars ($61.00) per week for each employee covered by this Agreement who works at least eight (8) hours in any given week for the duration of this Agreement."
 
 
 [3]
 David Sloan argues that his motivation was to save his business, because his hauling operation as it then existed could not be competitive in the residential market. However, he cites only the company's union obligations as the reason his hauling operation may not have been competitive
 
 
 [4]
 David Sloan stated that he gave the trucks to Darlene Sloan's business, rather than selling them, in order to insure that the trucks would be available when they were needed by Sloan Excavating
 
 
 [5]
 The Pension Fund posted to Sloan Excavating's account a contribution of $1,200 on July 6, 1987, and a contribution of $883.28 on August 10, 1987. The record does not state the identity of the party rendering these contributions
 
 
 [6]
 Centor Contractors, 831 F.2d at 1312 (quoting Penntech Papers, 706 F.2d at 24)
 
 
 [7]
 Centor Contractors, 831 F.2d at 1312 (quoting Penntech Papers, 706 F.2d at 24)