**CHICAGO DISTRICT COUNCIL OF CARPENTERS PENSION FUND, et al., Plaintiffs,**

v.

**P.M.Q.T., INC. and P.M.Q.T./Nevada, Inc., Defendants.**

No. 94 C 6785.

United States District Court, N.D. Illinois.

Dec. 10, 1996.

Mary Elizabeth Halloran, Whitfield Gregorio, Chicago, IL, for plaintiffs.

Robert M. Salzman, Pfeffer, Becker & Cerveny, Ltd., Chicago, IL, for defendants.

### MEMORANDUM OPINION AND ORDER

KEYS, United States Magistrate Judge.

This matter comes before the Court on Trust Funds' Motion for Summary Judg-

ment, pursuant to Federal Rule of Civil Procedure 56. For the following reasons, Trust Funds' Motion is granted.

## BACKGROUND

Plaintiffs are the Chicago District Council of Carpenters Pension Fund, Chicago District Council of Carpenters Welfare Fund, and the Chicago and Northeast Illinois District Council of Carpenters Apprentice and Trainee Program (collectively the "Trust Funds"). The Trust Funds provide medical, pension, and other benefits to covered carpenters and their dependents. (Trust Funds' Statement of Uncontested Material Facts Pursuant to Local Rule 12(m) [Pls.' 12(m) ] ¶ 2; Affidavit of Robert Newell [Newell Aff.], ¶ 3.)

Defendants are P.M.Q.T., Inc., a company incorporated in Illinois in 1985 ("PMQT Illinois"), and P.M.Q.T./Nevada, Inc., a company incorporated in Nevada in 1988 ("PMQT Nevada"). Both PMQT Illinois and PMQT Nevada subcontract carpenters to various trade shows to assist in assembling displays and exhibits. Peter Miles incorporated PMQT Illinois and PMQT Nevada, and is the president and sole shareholder of both entities.[1] (Miles Dep. at 4–5, 16–17; Pls.' 12(m), ¶ 16.)

This suit concerns Defendants' liability for pension contribution payments, which the Trust Funds claim Defendants owe as part of a collective bargaining agreement with the Chicago and Northeast Illinois Carpenters Union (the "Union") under the Employee Retirement Income Security Act of 1974 ("ERISA"), § 502, as amended, 29 U.S.C. § 1132. On September 29, 1985, PMQT Illinois entered into a multi-employer collective bargaining agreement ("CBA") with the Union. Pursuant to that CBA, PMQT Illinois is required to make contribution payments to the Trust Funds for each hour worked by its carpenter employees. Additionally, PMQT Illinois is required to make contributions to the Trust Funds measured by the hours worked by subcontractors that are not signatory to the CBA with the Union. (Newell Aff., ¶¶ 4 & 5; Pls.' 12(m), ¶¶ 3 & 11; Plaintiffs' Requests for Admission [Req. for Admis.], ¶ 2.) PMQT Nevada was not a signatory to the CBA.

In 1993, in an effort to determine whether the requisite contributions were being made by PMQT Illinois, the Trust Funds exercised their authority under the CBA[2] and requested that PMQT Illinois and PMQT Nevada turn over their records. The defendant companies refused the Trust Funds' audit request. Thereafter, on November 14, 1994, the Trust Funds filed this action to compel both companies to submit to the requested audit, and to obtain a judgment for any contributions owed, as determined by the audit, as well as the related fees, costs, liquidated damages, and interest.

In their Complaint, the Trust Funds allege that PMQT Nevada is the alter ego of PMQT Illinois, and as such, PMQT Nevada is bound by the CBA. The Trust Funds allege that both companies breached the CBA by underpaying contributions owed to the Trust Funds. In support of their alter ego claim, the Trust Funds allege that: (1) the business transactions and operations of the two companies have been, and continue to be, intermingled; (2) PMQT Illinois employees have been paid for their work pursuant to the CBA from PMQT Nevada's accounts; (3) PMQT Nevada has paid fringe benefit contributions for PMQT Illinois employees; (4) both companies are commonly controlled, operated, and managed; and (5) PMQT Nevada is merely a disguised continuance of PMQT Illinois.

In January of 1995, PMQT Illinois filed its Answer, denying the allegations, and PMQT Nevada moved to dismiss the lawsuit, asserting lack of subject matter and personal jurisdiction and failure to state a claim upon which relief could be granted. The Court denied PMQT Nevada's motion and, thereafter, the Trust Funds proceeded with discovery on the limited issue of the corporate relationship between PMQT Nevada and

---

1. PMQT Nevada was previously owned by six additional shareholders. (Deposition of Mr. Miles [Miles Dep.] 16–17.)

2. One provision of the CBA requires signatory employers to submit to an audit by the Trust Funds' retained auditor in order to verify that contributions have been properly paid.

PMQT Illinois. (Memorandum Opinion and Order, March 27, 1995.)

In July of 1995, the Trust Funds' auditor completed an audit of both companies. The audit revealed contributions due in the amount of $35,267.27, based upon a finding that the companies failed to report and pay fringe benefit contributions for 6,606.84 hours of work performed from October of 1991 through March of 1995. (Pls.' 12(m), ¶ 9; Appendix in Support of Pls.' 12(m), Ex. E. [Auditor's Report].)

During the course of discovery, the Trust Funds deposed several employees of the defendant companies, including Mr. Miles, the president of both companies, and Robert Burkum, the accountant for both companies. Messrs. Miles' and Burkum's depositions were continued because they failed to produce documentation or information to refute the alter ego claim. (Pls.' 12(m), ¶ 27.) Although the Court's March 4, 1996 Order directed Mr. Miles to produce, to the Trust Funds' counsel, by March 13, 1996, any documents refuting the auditor's findings or the alter ego allegations, no such documents were ever produced by either PMQT Illinois or PMQT Nevada. (Pls.' 12(m), ¶ 27; Affidavit of Janet Adams, ¶¶ 5, 8.)

Also during pre-trial discovery proceedings, on February 29, 1996, the Trust Funds served Defendants' counsel with Requests for Admission, pursuant to Federal Rule of Civil Procedure 36. Although Defendants' counsel withdrew from the case on March 4, 1996, counsel forwarded the Requests for Admission to Mr. Miles, with an attached letter informing him that his answers to the Requests for Admission were due on March 30, 1996, and that failure to file timely answers could result in the Court finding that he had admitted all the facts alleged in the request.[3] The letter made reference to Federal Rule of Civil Procedure 36. (Memoran-

dum Opinion and Order, May 20, 1996, at 2–3.)

Despite the letter from counsel, Mr. Miles failed to timely file his response to the Requests for Admission, which was due on March 30, 1996. Five weeks after a response was due, on May 8, 1996, Defendants, by new counsel, filed an emergency motion, requesting leave to file their response to the Trust Funds' Requests for Admission. In their motion, Defendants argued that, during the filing period, Mr. Miles was without an attorney and did not recognize the effect of his failure to respond. Defendants' new counsel also argued that he did not learn of the Requests for Admission until the time to file the answers had expired.[4] The Court denied Defendants' motion, finding that the failure to timely respond was due to Mr. Miles' "inexcusable neglect."[5] (Memorandum Opinion and Order, May 21, 1996, at 6.)

On June 5, 1996, the Trust Funds moved for summary judgment on the grounds that the defendant companies had admitted all material facts. The Trust Funds argue that, by failing to respond to the Requests for Admission, Mr. Miles has admitted that PMQT Nevada is the alter ego of PMQT Illinois and that the Auditor's Report accurately reflects the fringe benefit contributions owed by the defendant companies to the Trust Funds for the period of October, 1991 through March, 1995. Specifically, Plaintiffs argue that Mr. Miles has admitted: (a) that both companies breached provisions of the CBA by failing to allow an audit of their books and records upon demand; (b) that he is the president and majority shareholder of both companies; (c) that the two companies have shared several common carpenter employees; (d) that approximately $71,500 was transferred from PMQT Illinois to PMQT Nevada, and approximately $116,-

---

**3.** The Court granted Defendants' counsel permission to withdraw based on Mr. Miles' consent and the Court's recognition that Mr. Miles was not cooperating with counsel—for example, he failed to provide necessary documents. (Memorandum Opinion and Order, May 21, 1996, at 2.)

**4.** Defendants' new counsel filed his appearance on April 4, 1996.

**5.** The Court reasoned that the March 4, 1996 letter from counsel was sufficiently "clear and unambiguous" as to warn Mr. Miles of the legal consequences of not responding. The Court further noted that Mr. Miles did not take his "obligations seriously", as evidenced by his failure to meet Court-mandated deadlines for retaining new counsel and objecting to the Auditor's Report. (Memorandum Opinion and Order, May 21, 1996, at 6–7.)

430 was transferred from PMQT Nevada to PMQT Illinois, between October of 1991 and March of 1995; (e) that the two companies share the same mailing address; (f) that the companies are involved in the same type of business—constructing and dismantling trade show exhibits; and (g) that the companies share the same office space, equipment, attorney, accountant, management, and payroll service. (Req. for Admis. ¶¶ 6, 7, 8, 9, 11, 12, 15, 16, 24, and 25; Pls.' 12(m) ¶¶ 16–20, 22, 23, 27, and 28.)

In their response to the Trust Funds' motion for summary judgment, Defendants contend that summary judgment is inappropriate because a genuine issue of material fact exists as to the accuracy of the contribution calculation in the Auditor's Report. Moreover, Defendants assert that inconsistencies between the admissions and the Answer, as well as affidavits and deposition testimony, demonstrate another genuine issue of material fact—whether the companies are alter egos.

### SUMMARY JUDGMENT STANDARD

Federal Rule of Civil Procedure 56(c) provides that summary judgment is proper when the pleadings and supplemental materials present "no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986) In a motion for summary judgment, the initial burden is on the moving party to identify "those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Id.* (quoting FED. R. CIV. P. 56(c)). Summary judgment is then appropriate, unless there is sufficient evidence "such that a reasonable jury could return a verdict for the non-mov-

ing party." *Anderson v. Liberty Lobby*, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).

The summary judgment standard requires more than a "scintilla of evidence," *Tolle v. Carroll Touch, Inc.*, 23 F.3d 174, 178 (7th Cir.1994), to "defeat an otherwise properly supported motion for summary judgment." *Anderson*, 477 U.S. at 247–48, 106 S.Ct. at 2510. "A fact is material only if it might affect the outcome of the case under the governing law." *Anweiler v. American Elec. Power Serv. Corp.*, 3 F.3d 986, 990 (7th Cir. 1993); *Anderson*, 477 U.S. at 249–50, 106 S.Ct. at 2511 ("If the evidence is merely colorable ... or is not significantly probative ... summary judgment may be granted.") (citations omitted).

In deciding a motion for summary judgment, the Court usually must view all facts and inferences in the light most favorable to the non-moving party. *See Anderson*, 477 U.S. at 254–55, 106 S.Ct. at 2513–15; *Serfecz v. Jewel Food Stores*, 67 F.3d 591, 596 (7th Cir.1995), *cert. denied*, — U.S. ——, 116 S.Ct. 1042, 134 L.Ed.2d 189 (1996). However, PMQT Illinois and PMQT Nevada failed to answer or object to the Trust Funds' Requests for Admission, pursuant to Federal Rule of Civil Procedure 36. Under Rule 36(a), a party must answer each matter for which an admission is requested, within thirty days of service thereof, otherwise the matter is deemed admitted. Rule 36(b) provides that "[a]ny matter admitted under this rule is conclusively established unless the court on motion permits withdrawal or amendment of the admission." [6] Further, matters that are deemed admitted, due to a party's failure to respond to a request for admission, can form the basis for granting summary judgment. *United States v. Kasuboski*, 834 F.2d 1345, 1350 (7th Cir.1987). Accordingly, in deciding this motion for summary judgment, the Court accepts as true all material facts con-

---

**6.** The Court exercised its discretion and considered Defendants' eleventh hour attempt to withdraw the admissions and to file their response to Plaintiffs' Requests for Admission. However, the Court denied Defendants' emergency motion because it was filed on May 8, 1996, five weeks after their response was due; discovery had closed on April 1, 1996; and Plaintiffs had relied upon the admissions in preparing their motion for summary judgment, which was originally due on May 14, 1996. *See In re Narowetz Mechanical Contractors, Inc.*, 898 F.2d 1306, 1310 (7th Cir. 1990) (holding no abuse of discretion where court declined to conform its busy docket so as to relieve litigants from the consequences of not meeting deadline).

tained in the Trust Funds' Requests for Admission. However, all other facts (those not contained in the Requests for Admission) will be construed in the light most favorable to Defendants.

### DISCUSSION

#### A. *Rule 36 Admissions*

Defendants seek to undo the effect of their default admissions by arguing that certain depositions and affidavits contradict the admissions and, therefore, genuine issues of material fact exist as to whether the companies are alter egos, and whether the Auditor's Report is accurate. (Defendants' Response to Plaintiffs' Motion for Summary Judgment [Defs.' Resp. Summ. J.] at 1–2.) Defendants misinterpret Federal Rule of Civil Procedure 36.

■ "Rule 36(a) of the Federal Rules of Civil Procedure clearly provides that a party must answer each matter for which an admission is requested within 30 days or the matter is deemed admitted." [7] *Kasuboski,* 834 F.2d at 1349. Allowing Defendants to even raise issues of fact from affidavits and depositions supporting their response to summary judgment would allow Rule 56 to swallow Rule 36. The purpose of Rule 36 admissions is to allow "parties to narrow the issues to be resolved at trial by effectively identifying and eliminating those matters on which the parties agree." *Kasuboski,* 834 F.2d at 1350. This function would be defeated if parties were permitted to contest, under Rule 56, a matter already conclusively established under Rule 36. *Id.; see also* FED. R. CIV. P. 36 advisory committee's note ("Unless the party securing an admission can depend on its binding effect ... the purpose of the rule is defeated.") *Cf. Keller v. United States,* 58 F.3d 1194, 1198 n. 8 (7th Cir.1995) (quoting MICHAEL H. GRAHAM, FEDERAL PRACTICE AND PROCEDURE § 6726 (interim ed.) (Rule 36 admissions "have the effect of withdrawing a fact from contention.")); *To-*

*bey v. Extel/JWP, Inc.,* 985 F.2d 330, 333 (7th Cir.1993) ("An admission trumps evidence, rather than vice versa.") Furthermore, "[a]dmissions made under Rule 36, even default admissions, can serve as the factual predicate for summary judgment." *Kasuboski,* 834 F.2d at 1350.

■ While the Court recognizes that Defendants' failure to timely respond to the Requests for Admission has resulted in harsh consequences, "this result ... is necessary to insure the orderly disposition of cases ...." *Kasuboski,* 834 F.2d at 1350. Moreover, unless the Court allows default admissions to be withdrawn, which it declined to do here, there is no discretion to re-examine facts once they are deemed admitted.

#### B. *Alter Ego Doctrine*

The Trust Funds contend that PMQT Nevada is the alter ego of PMQT Illinois. They argue that the purposes, operations, and owners of the two corporations are so similar as to be indistinguishable. If PMQT Nevada and PMQT Illinois are alter egos, then the Trust Funds shall recover against both companies for any delinquent pension contributions, pursuant to the CBA. *See Central States, Southeast and Southwest Areas Pension Fund v. Sloan,* 902 F.2d 593, 596 (7th Cir.1990) (citing *Penntech Papers, Inc. v. National Labor Relations Bd.,* 706 F.2d 18, 24 (1st Cir.1983), "An 'alter ego' finding ... will bind a non-signatory to a collective bargaining agreement....").

#### 1. Alter Ego Doctrine in General

■ The alter ego doctrine treats two nominally separate business entities as if they were a single, continuous employer to "prevent a corporation that has acted fraudulently or unjustly from protecting itself from liability by shielding itself with the protective mantle of the corporate form." *Lumpkin v. Envirodyne Indus., Inc.,* 933 F.2d 449, 459

---

7. Rule 36(a) provides in pertinent part:
   "Each matter of which an admission is requested shall be separately set forth. The matter is admitted unless, within 30 days after service of the request, or within such shorter or longer time as the court may allow ... the party to whom the request is directed serves upon the party requesting the admission a written answer or objection addressed to the matter, signed by the party or by the party's attorney...."
   FED. R. CIV. P. 36(a).

(7th Cir.), *cert. denied*, 502 U.S. 939, 112 S.Ct. 373, 116 L.Ed.2d 324 (1991). The rationale behind the doctrine is that, if the corporations themselves disregard the "legal separation" and "proper formalities," then "the law will likewise disregard them so far as is necessary to protect . . . ." other individuals' rights. 1 WILLIAM M. FLETCHER, FLETCHER CYCLOPEDIA OF THE LAW OF PRIVATE CORPORATIONS, § 41.10 (perm. ed. rev.vol.1990).

## 2. Alter Ego Doctrine in ERISA Context

■ The alter ego doctrine is applied in the ERISA context to prevent an employer from evading its pension fund obligations either through a "sham transfer of assets", *International Union of Operating Eng'rs v. Centor Contractors, Inc.*, 831 F.2d 1309, 1312 (7th Cir.1987) (quoting *Penntech*, 706 F.2d at 24), or by "fractionalizing its business operations." *See Central States, Southeast and Southwest Areas Pension Fund v. Ditello*, 974 F.2d 887, 890 (7th Cir.1992) (quoting *Pension Benefit Guaranty Corp. v. Center City Motors Inc.*, 609 F.Supp. 409, 412 (S.D.Cal.1984)); *Lumpkin*, 933 F.2d at 459. The rationale behind applying the doctrine in cases involving pension contributions protected by ERISA is that an employer who evades his pension responsibilities " 'gain[s] an unearned advantage in his labor activities. . . .' " *National Labor Relations Bd. v. Dane County Dairy*, 795 F.2d 1313, 1321 (7th Cir.1986) (quoting *Alkire v. National Labor Relations Bd.*, 716 F.2d 1014, 1018 (4th Cir. 1983). Moreover, "underlying congressional policy behind ERISA clearly favors the disregard of the corporate entity in cases where employees are denied their pension benefits." *Lumpkin*, 933 F.2d at 461.

■ Application of the alter ego doctrine in the ERISA context depends on the specific facts in each case. *Koch Refining v. Farmers Union Cent. Exchange, Inc.*, 831 F.2d 1339, 1345 (7th Cir.1987), *cert. denied*, 485 U.S. 906, 108 S.Ct. 1077, 99 L.Ed.2d 237 (1988). In determining whether one corporation is an alter ego of another corporation, courts will examine: (1) the extent to which the corporations are treated as separate entities by the shareholder(s); (2) the fraudulent intent involved; and (3) the amount of injustice which parties would suffer by respecting the corporate entity. *Lumpkin*, 933 F.2d at 461; *accord Central States, Southeast and Southwest Areas Pension Fund v. Central Transp., Inc.*, 85 F.3d 1282, 1287 (7th Cir. 1996). None of these factors are entirely dispositive; however, an alter ego relationship will not be found without some showing of an unlawful motive or intent. *See Centor*, 831 F.2d 1309, 1312 (7th Cir.1987) (quoting *Penntech*, 706 F.2d at 24, " ' [u]nlawful motive or intent are critical inquiries in an alter ego analysis. . . .' ").

■ Specific factors which tend to demonstrate an alter ego relationship include: " 'substantially identical management, business purpose, operation, equipment, customers, and supervision as well as ownership.' " *Board of Trustees of Chicago Plastering Inst. Pension Fund v. William A. Duguid, Co.*, 761 F.Supp. 1345, 1348 (N.D.Ill.1991) (quoting *Crawford Door Sales Co., Inc. and Cordes Door Co., Inc.*, 226 N.L.R.B. 1144, 1976 WL 7566 (1976)); *accord Chicago District Council of Carpenters Pension Fund v. Sunshine Carpet Servs., Inc.*, 866 F.Supp. 1113, 1116 (N.D.Ill.1994). In addition, an alter ego relationship has been found where two corporations are "so integrated or intermingled [in their] assets and affairs that 'no distinct corporate lines are maintained.' " *Dane County Dairy*, 795 F.2d at 1321 (quoting *Dist. 23, United Mine Workers of America*, 271 N.L.R.B. 461, 1984 WL 36635 (1984)).

For example, one company was deemed the alter ego of a newly created second company based on the companies' close financial and business operation relationship. *Sloan*, 902 F.2d at 597. In balancing the facts in its alter ego analysis, the court stated that, "[a]lthough the businesses maintained separate telephone numbers, billing operations, books and records," *id.*, other significant factors clearly demonstrated that the companies were alter egos: (a) both companies engaged in excavating operations; (b) trucks from the first entity were transferred to the second entity "without any consideration in return"; (c) several unionized employees from the first entity stopped working there and began

working for the second entity; (d) the second entity kept funds in the first entity's account and paid its employees' wages from this account; (e) bank loans for each entity were signed by both the defendant and his wife and were secured with one of the trucks that had been transferred to the second entity; (f) the offices of both companies were located on the same premises, which were owned by the defendant and his wife as joint tenants; and (g) the defendant operated one business, while his wife operated the other, with offices only one hundred and twenty feet apart. *Sloan*, 902 F.2d at 594–97. These factors led the court to conclude that "[t]he creation of [the second company] was specifically motivated by [the defendant's] desire to avoid his obligations under the union contract." *Id.* at 595. Accordingly, the second entity was obligated to honor the pension contribution terms of a CBA entered into between the first entity and a union. *Sloan*, 902 F.2d at 595; *see also Sunshine Carpet*, 866 F.Supp. at 1116–17 (applying alter ego doctrine where one corporation was used by defendant as a front to receive subcontracting work for union employees and a nearly identical, second corporation was used to skirt pension fund contributions).

### 3. Applying Alter Ego Analysis to the Present Case

■ The Court finds that the facts, which were conclusively established when Defendants failed to respond to the Trust Funds' Requests for Admission, are sufficient to warrant application of the alter ego doctrine. Defendants admitted that Mr. Miles is the president and the majority shareholder of PMQT Illinois and PMQT Nevada and that both companies engage in erecting and dismantling trade show displays. (Req. for Admis., ¶¶ 7, 8, 15.) Defendants admitted that several individuals, including Union members, performed carpentry work for both companies, in a variety of locations outside of Illinois, for which fringe benefit contributions were not made. (Req. for Admis., ¶¶ 9, 13, 14, 21, 22.) They also admitted that Mr. Miles' wife performed administrative duties

for both companies, but that she was compensated only by PMQT Nevada. (Req. for Admis., ¶ 10.) Defendants admitted that both companies share the same mailing address, office space, attorney, accountant, management, and payroll service. (Req. for Admis., ¶¶ 16, 25.) Defendants further admitted that, from October of 1991 through March of 1995, PMQT Illinois transferred approximately $71,500 to PMQT Nevada and that PMQT Nevada transferred approximately $116,430 to PMQT Illinois. (Req. for Admis., ¶¶ 11, 12.)

Furthermore, Defendants admitted that PMQT Illinois and PMQT Nevada breached the provisions of the CBA by failing to allow the Trust Funds to audit their books and records after a demand for an audit was made, and that Defendants' records regarding overtime worked by the employees of both companies were never made available to the Plaintiffs or their auditor. (Req. for Admis., ¶¶ 6, 17.) Finally, Defendants admitted that the Auditor's Report accurately reflects the fringe benefit contributions owed by Defendants to Plaintiffs for the period from October of 1991 through March of 1995, and that Defendants have not provided Plaintiffs with documents to refute the findings of the Auditor's Report.[8] (Req. for Admis., ¶¶ 18, 24.)

These admissions demonstrate that Mr. Miles did not treat the companies as separate entities. The Court further finds that Mr. Miles' disregard of the proper formalities between the two companies indicates that he used PMQT Illinois to obtain projects reserved for Union members and then used PMQT Nevada to skirt pension contributions. The Court is satisfied that Mr. Miles' unlawful motive has been demonstrated. Moreover, Union members would be cheated out of their pension funds if this Court allowed Defendants to avoid their legal obligations under the CBA. Thus, because the default admissions resulted in resolution of all material facts, and conclusively established that PMQT Nevada is merely the alter ego of

---

**8.** The Court again notes its March 4, 1996 Order which directed Mr. Miles to produce to Defendants any documents he might have that would refute the auditor's findings in this regard. His failure to do so warrants an inference that no such documents exist.

PMQT Illinois, Plaintiffs are entitled to judgment as a matter of law.

### 4. Independent Basis for Alter Ego Finding

Even assuming, *arguendo*, that Defendants' failure to respond to the Trust Funds' Requests for Admission did not result in all material facts being conclusively established, this Court has an independent basis for concluding that PMQT Illinois and PMQT Nevada are alter egos. A number of facts indicate that Mr. Miles did not regard the two corporations as separate entities. PMQT Nevada and PMQT Illinois share the same business purpose—both are labor service companies engaged in erecting and dismantling trade show exhibits. (Miles Dep. at 19–20.) Mr. Miles is the president of both companies and operates both businesses out of the same office space in his home. (Miles Dep. at 4, 12, 16–17.) Both companies share office equipment, including a computer and a photocopier. (Miles Dep. at 12.)

In addition, PMQT Illinois and PMQT Nevada share employees, including Gregory Rupp, Steve Miles, Stan Wilczeck, Ben DeBoer, Jerry Roma, Matt Ove, Ed Zdzinicki, and George Bean. (Miles Dep. at 20–23.) Moreover, the assets of each company are intermingled and transferred back and forth. (Miles Dep. at 30–31.) In fact, PMQT Illinois relies exclusively on PMQT Nevada's checking account to pay its employees. (Miles Dep. at 30.)

Although Defendants argue that the intent element is not met in view of the fact that the corporations were incorporated several years apart, and in advance of PMQT Illinois becoming signatory to the CBA, the Court finds that Mr. Miles' motivation in setting up the second corporation was to fraudulently avoid his pension fund obligations.[9] Mr. Miles testified as follows during his deposition:

Q. So for Gregory Rupp when he worked out of the Chicagoland area did you pay his benefits?

A. Yes.

Q. But for the carpenter employees that worked beneath him, their benefits were not paid when they were out of Chicago?
A. Greg Rupp was the exception. He was a full-time employee regarding going out and supervising for me. That was his role. He would go out and supervise the jobs for me so that he would work enough hours to get his benefits, okay. After that he would work management for [PMQT] Nevada.... So as part of his agreement with me I would pay his hours going on the road and supervising, okay, and when he hit his minimum when he was gone on the road, then he would be working in Las Vegas for Nevada as management working the floor for me.

(Miles Dep. at 64–65.) In light of this testimony, it is clear that Mr. Miles' intent was to avoid contributing any more than the required minimum hours. Mr. Miles explained that he would assign hours worked by his employees to either PMQT Illinois or PMQT Nevada, depending on whether his minimum hours requirement was met, pursuant to the CBA.

Thus, notwithstanding the Requests for Admission, this Court concludes that PMQT Nevada is nothing more than a mere paper entity, used by Mr. Miles for the purpose of avoiding PMQT Illinois' obligations under the CBA.

### C. *Damages*

■ As a result of this Court's finding that PMQT Nevada is the alter ego of PMQT Illinois, PMQT Nevada is bound by the terms of the CBA entered into by PMQT Illinois. Therefore, PMQT Nevada's funds may be reached in order to pay what is owed to the Trust Funds. The Auditor's Report revealed that the companies owe the Trust Funds $35,267.27 for fringe benefits. Defendants admitted that this amount accurately reflects the fringe benefit contributions owed by them, when they failed to respond to the Trust Funds' requests for admission. (Req. for Admis., ¶¶ 18, 24.) Moreover, Defendants never produced documents to refute the Auditor's Report. Defendants' failure to

---

9. Simply because Mr. Miles was not as quick as others to devise a scheme to avoid contributions—by setting up two "separate entities"—does not mean that he lacked the requisite intent.

provide any documents to disprove the auditor's findings provides an independent basis for this Court's determination that the Auditor's Report is the proper measure of damages. *See Combs v. King,* 764 F.2d 818, 823 (11th Cir.1985) (holding that employer has statutory duty under ERISA to maintain time records).

██ Section 502(g) of ERISA, as amended by the Multiemployer Pension Plan Amendments Act of 1980, provides that:

(2) In any action under this subchapter by a fiduciary for or on behalf of a plan to enforce section 1145 of this title in which a judgment in favor of the plan is awarded, the court shall award the plan—

(A) the unpaid contributions,

(B) interest on the unpaid contributions,

(C) an amount equal to the greater of—

(i) interest on the unpaid contributions, or

(ii) liquidated damages provided for under the plan in an amount not in excess of 20 percent (or such higher percentage as may be permitted under Federal or State law) of the amount determined by the court under subparagraph (A),

(D) reasonable attorney's fees and costs of the action, to be paid by the defendant, and

(E) such other legal or equitable relief as the court deems appropriate.

For purposes of this paragraph, interest on unpaid contributions shall be determined by using the rate provided under the plan, or, if none, the rate prescribed under section 6621 of Title 26.

29 U.S.C. § 1132(g)(2) (" § 1132(g)(2)"). The provisions of this section are "mandatory in an action 'in which a judgment in favor of the plan is awarded.'" *Gilles v. Burton Constr. Co.,* 736 F.2d 1142, 1144 (7th Cir.1984). Given that § 1132(g)(2) is non-discretionary, and that congressional intent was "to promote plan enforcement and protect employee funds from the expenses of enforcement litigation," *Plumbers' Pension Fund v. Domas Mechanical Contractors, Inc.,* 778 F.2d 1266, 1271 (7th Cir.1985), the Trust Funds are entitled to reasonable attorney's fees and costs incurred, including the audit fee. In addition, the Trust Funds are entitled to an award of either double interest on the amount of unpaid contributions, or single interest plus liquidated damages, whichever is greater. *See Central States, Southeast and Southwest Areas Pension Fund v. Gerber Truck Serv., Inc.,* 870 F.2d 1148, 1156 (7th Cir.1989) (awarding liquidated damages to "compensate the [pension] plans for delay and give employers an incentive to be forthcoming with payments.").

### CONCLUSION

The Trust Funds are entitled to summary judgment as a matter of law because there is no genuine issue of material fact regarding alter ego liability.

**IT IS THEREFORE ORDERED** that:

The Trust Funds' Motion for Summary Judgment be, and the same hereby is, **GRANTED.**

**IT IS ALSO ORDERED** that:

Defendants shall pay the Trust Funds $35,267.27 for unpaid pension contributions.

**IT IS FURTHER ORDERED** that:

The Trust Funds shall file, within twenty-one days from the date of this Order, a verified petition of fees, costs, interest and/or liquidated damages.