USCA1 Opinion

 

 
 United States Court of Appeals
 For the First Circuit
 ____________________
 
 No. 97-2285
 
 MASSACHUSETTS CARPENTERS
 CENTRAL COLLECTION AGENCY,
 
 Plaintiff, Appellee,
 
 v.
 
 BELMONT CONCRETE CORPORATION AND
 ALGAR CONSTRUCTION CORPORATION,
 
 Defendants, Appellants.
 
 ____________________
 
 
 APPEAL FROM THE UNITED STATES DISTRICT COURT
 FOR THE DISTRICT OF MASSACHUSETTS
 
 [Hon. Douglas P. Woodlock, U.S. District Judge]
 
 ____________________
 
 Before
 
 Lynch, Circuit Judge,
 
 Coffin and Bownes, Senior Circuit Judges.
 
 ____________________
 
 George A. Fairbanks, III, with whom Fairbanks & Koczera,John F. Creedon, and Creedon & Murphy were on brief, for
 appellants.
 
 Aaron D. Krakow, with whom Krakow & Souris was on brief,
 for appellee.
 
 ____________________
 
 March 27, 1998
 ____________________
 
 
 
 LYNCH, Circuit Judge. Within a year of signing a
 collective bargaining agreement with the Massachusetts
 Carpenters Union, the Belmont Concrete Corporation went out of
 business. Under that agreement, Belmont was obligated to pay
 into Union employee benefit funds for the benefit of its
 workers. Another concrete company, Algar Construction
 Corporation (owned and managed from the same location by
 members of the same families as Belmont) employed many of
 Belmont's employees, used some of Belmont's equipment, and
 worked on contracts for the same company with which Belmont had
 worked. When Belmont stopped making the payments it was
 obligated to make to the fund, the Massachusetts Carpenters
 Central Collection Agency (MCCCA) sued, alleging violations of
 Section 515 of the Employee Retirement Income Security Act
 ("ERISA"), 29 U.S.C. 1145. It sued Belmont on the agreement
 and Algar on the theory that Algar was an alter ego of Belmont,
 and so liable for its obligations to the benefit funds. The
 defendants protested that the person who signed the agreement
 for Belmont had no authority to do so, that there was never an
 enforceable agreement, and that Algar, which had never signed
 the agreement, could not be liable for Belmont's debts.
 On summary judgment, the district court ruled for the
 plaintiff in a carefully reasoned opinion. It ordered
 Belmont, now defunct and assetless, and Algar to pay MCCCA
 $121,339.97 in unpaid contributions and penalties. We affirm
 largely on the basis of the district court opinion, and further
 discuss the alter ego issue. We do so because this issue
 frequently arises in suits to hold one company liable for
 benefit plan contributions another company has contracted to
 make under the Multiemployer Pension Plan Amendments Act of
 1980 (MPPAA), Pub. L. 96-364, 94 Stat. 1208 (1980), which
 amends ERISA, 29 U.S.C. 1001-1461. We also do so to
 emphasize that the alter ego jurisprudence developed in cases
 brought under the National Labor Relations Act, 29 U.S.C. 
 141-197, is applicable in cases brought under ERISA where the
 basis for imposition of liability is also the alter ego
 doctrine.
 I
 As summary judgment has been granted, we review the
 facts in the light most favorable to the defendants and will
 draw all reasonable inferences in their favor. See Champagnev. Servistar Corp., 1998 WL 99687 *1 (1st Cir. Mar. 12, 1998). 
 The district court's opinion thoroughly recounts the facts of
 the case, and we focus on the facts relevant to the alter ego
 issue.
 A. The Companies
 Belmont and Algar both perform concrete work in the
 construction industry in Massachusetts. Algar was formed in
 1990 and remains active today. Belmont was formed in 1992 and
 was active until the end of 1993. Each company had its
 principal place of business at 37 Belmont Street in Brockton,
 Massachusetts. Belmont occupied offices on the fourth floor;
 Algar occupied offices in the basement.
 Belmont and Algar are family businesses owned and
 operated by members of the Bota, Diaz, and Guerreiro families. 
 Belmont was formally owned by Lionel Diaz ("Diaz") and Anita
 Bota (Diaz' wife's cousin). Although an "owner," Anita Bota
 only performed occasional secretarial work for Belmont; Belmont
 was actually controlled by Diaz, Victor Guerreiro
 ("Guerreiro"), and Horacio Bota ("Bota"), Anita Bota's father. 
 These men negotiated the contracts, supervised the construction
 sites, and generally managed the business. Algar was formally
 owned by Margaret Bota (Bota's daughter) and Sarita Diaz (Diaz'
 wife, Guerreiro's daughter and Bota's niece). Like Anita Bota,
 the two "owners" performed primarily secretarial work, and
 Algar was actually controlled by Bota, Guerreiro and Diaz.
 Although Bota, Diaz, and Guerreiro took the position
 that they did no work for Algar until all Belmont work had been
 completed, specific facts from their own depositions establish
 some overlap in responsibilities. Guerreiro stated in his
 deposition that he was involved in the preparation of bids and
 negotiation of contracts for Algar in 1993. Bota stated that
 he signed a contract for construction work on behalf of Algar
 in 1993. And Diaz acknowledged that his stamp was used to sign
 a contract with Middlesex Construction Corporation on behalf of
 Algar in 1993.
 Belmont and Algar were intertwined in other ways. 
 They shared employees. Maurice Law and Paul Merhey acted as
 supervisors and estimators for Belmont, and then for Algar
 after Belmont ceased conducting business. Other Algar
 employees who previously worked for Belmont included Mario
 Rosa, Antonio Gomes, Joao DaSilva, George Raposa, Jeff Bassett,
 Paulo Costa, Manual Pina, and Joao Viveiros. Belmont and Algar
 also shared business. Belmont was a subcontractor for
 Middlesex Construction for two of the five construction
 projects it performed after April 1, 1993 (until it ceased
 conducting business near the end of 1993); Algar was a
 subcontractor for Middlesex Construction for eight of the
 twelve projects it performed after April 1, 1993. Belmont also
 made use of Algar's trucks and equipment through an informal
 "leasing" arrangement for which there is no documentation.
 Finally, there is also evidence that employees were
 working on both Algar and Belmont projects at the same time. 
 On May 1, 1993, a Union representative saw Algar employees
 leave a job at a West Springfield site and travel to a worksite
 where there was a truck belonging to Belmont. The construction
 supervisor at the second site informed the Union representative
 that he worked for Belmont and that Belmont was the contractor
 at that location. 
 B. The Agreement
 On April 23, 1993, Bota, on Belmont's behalf, signed
 the State-Wide Agreement ("Agreement") with the Carpenters
 Union. The Agreement binds each signatory contractor to the
 terms and conditions of the collective bargaining agreements of
 the various Massachusetts Carpenters Local Unions, which in
 turn require that the contractor make employee contributions to
 the MCCCA for each hour of carpentry work performed by its
 employees. In addition, the collective bargaining agreements
 incorporate by reference the trust agreements of the Carpenters
 Union affiliated employee benefit funds.
 After signing, Belmont complied in part with its
 obligations under the Agreement to make employee benefit
 contributions to the MCCCA. Belmont's carpenters performed
 3,925 hours of work between April 1993 and November 1993. 
 Belmont made contributions to the MCCCA for 2,144 hours of that
 work. 
 Algar never signed the Agreement. Between April 23,
 1993, and September 1996, Algar's carpenters performed
 approximately 8,070 hours of carpentry work. Algar made no
 contributions to MCCCA for this work.
 On March 9, 1995, MCCCA filed this action against
 Belmont and Algar, alleging violations of Section 515 of ERISA,
 29 U.S.C. 1145. MCCCA sought $3,271.37 in unpaid
 contributions from Belmont and $69,351.97 in unpaid
 contributions from Algar. MCCCA argued that Belmont was a
 signatory to the Agreement and bound by its terms, and that
 nonsignatory Algar was also bound by the Agreement by virtue of
 being Belmont's alter ego. Defendants responded that Bota did
 not have authority to sign the Agreement on Belmont's behalf,
 and that, regardless, Algar was not Belmont's alter ego. The
 district court granted summary judgment in MCCCA's favor,
 granting MCCCA the full amount of damages sought plus penalties
 as defined in the governing collective bargaining agreement --
 a total of $121,339.97. Defendants appeal.
 II
 The alter ego doctrine is meant to prevent employers
 from evading their obligations under labor laws and collective
 bargaining agreements through the device of making "'a mere
 technical change in the structure or identity of the employing
 entity . . . without any substantial change in its ownership or
 management.'" NLRB v. Hospital San Rafael, Inc., 42 F.3d 45,
 51 (1st Cir. 1994) (quoting Howard Johnson Co. v. Hotel
 Employees, 417 U.S. 249, 259 n.5 (1974)). Although the alter
 ego doctrine is primarily applied in situations involving
 successor companies, "where the successor is merely a disguised
 continuance of the old employer," C.E.K. Indus. Mechanical
 Contractors, Inc. v. NLRB, 921 F.2d 350, 354 (1st Cir. 1990)
 (citing Southport Petroleum Co. v. NLRB, 315 U.S. 100, 106
 (1992)), it also applies to situations where the companies are
 parallel companies. See Union Builders, Inc. v. NLRB, 68 F.3d
 520, 524 (1st Cir. 1995). In this case, Algar was both
 parallel to Belmont and successive to Belmont. A finding that
 two employers are alter egos will bind the nonsignatory to a
 collective bargaining agreement between the union and the
 nonsignatory's alter ego. See Hospital San Rafael, 42 F.3d at
 52-53; Penntech Papers, Inc. v. NLRB, 706 F.2d 18, 24 (1st Cir.
 1983). 
 Although developed in the labor law context, alter
 ego or successor liability analysis has been applied to claims
 involving employee benefit funds brought under ERISA and the
 LMRA. See Langone v. C. Walsh, Inc., 864 F. Supp. 233 (D.
 Mass. 1994), aff'd, 1996 WL 672277 (1st Cir. Nov. 20, 1996);
 Upholsterers' Int'l Union Pension Fund v. Artistic Furniture of
 Pontiac, 920 F.2d 1323 (7th Cir. 1990); Central States,
 Southeast and Southwest Areas Pension Fund v. Sloan, 902 F.2d
 593 (7th Cir. 1990); United Steelworkers v. Connors Steel Co.,
 847 F.2d 707 (11th Cir. 1988); Hawaii Carpenters Trust Funds v.
 Waiola Carpenter Shop, Inc., 823 F.2d 289 (9th Cir. 1987). The
 rationale is that "an employer who evades his pension
 responsibilities gains an unearned advantage in his labor
 activities. Moreover, underlying congressional policy behind
 ERISA clearly favors the disregard of the corporate entity in
 cases where employees are denied their pension benefits." 
 Chicago Dist. Council of Carpenters Pension Fund v. P.M.Q.T.,
 Inc., 169 F.R.D. 336, 342 (N.D. Ill. 1996) (citations and
 internal quotation marks omitted).
 In determining whether a nonsignatory employer is an
 alter ego of a signatory, we consider a variety of factors,
 including continuity of ownership, similarity of the two
 companies in relation to management, business purpose,
 operation, equipment, customers, supervision, and anti-union
 animus i.e., "whether the alleged alter ego entity was
 created and maintained in order to avoid labor obligations." 
 Hospital San Rafael, 42 F.3d at 50; see C.E.K., 921 F.2d at
 354. No single factor is controlling, and all need not be
 present to support a finding of alter ego status. See Hospital
 San Rafael, 42 F.3d at 51. In particular, there is no rule
 that wrongful motive is an essential element of a finding of
 alter ego status. See id.
 The defendants here argue that the rule of Hospital
 San Rafael is incorrect, and that wrongful motive is a sine qua
 non for finding alter ego status in an ERISA case. On this
 point, they say, there are material facts in dispute. 
 Defendants rely on United Elec., Radio & Mach. Workers v. 163
 Pleasant St. Corp., 960 F.2d 1080 (1st Cir. 1992), for this
 legal proposition. Although 163 Pleasant St. bears some
 similarity to the present case (the cause of action was based
 on ERISA and the LMRA and the plaintiffs sought back-payments
 to a health care fund), we think it is inapposite here. 
 Fundamentally, 163 Pleasant St. is a case about personal
 jurisdiction: whether there was personal jurisdiction in
 Massachusetts over a foreign parent corporation based on the
 activities of a Massachusetts subsidiary. The court held that
 personal jurisdiction cannot be exercised over a foreign
 company through a corporate veil-piercing theory absent a
 showing of fraud. This holding is not based on ERISA and the
 LMRA. In addition, we think the policies generally served by
 various corporate veil-piercing approaches, see Birbara v.
 Locke, 99 F.3d 1233 (1st Cir. 1996), address different
 interests than does the alter ego doctrine. We disapprove of
 the direct application of those veil-piercing rules for
 jurisdictional purposes to the very different problem we face
 here. 
 Rather, we think that the Hospital San Rafael case
 provides the better and more apt model. It is consonant with
 the alter ego jurisprudence developed in the labor law context
 and more fully serves the policies that underlie the MPPAA and
 ERISA. It is true that Hospital San Rafael and the present
 case arise in different contexts: Hospital San Rafael involved
 the NLRB's application for enforcement of its order to a
 successor hospital to bargain with a union that had been
 recognized at a predecessor hospital, based on the NLRB's
 determination that the successor and predecessor hospitals were
 alter egos. This case involves a direct action against the
 employer by the collection agency for a union-sponsored
 employee benefit fund. We think this is a distinction without
 a difference, at least for present purposes, as the fundamental
 alter ego analysis animating both situations is the same.
 III
 Applying the alter ego test, we conclude that Algar
 is Belmont's alter ego, and therefore liable under the
 Agreement. First, there is continuity of ownership. SeeHospital San Rafael, 42 F.3d at 51. Continuity of ownership
 has been found to exist when the nonsignatory and signatory
 companies are owned by members of the same family. See Sloan,
 902 F.2d at 597; J.M. Tanaka Constr., Inc. v. NLRB, 675 F.2d
 1029, 1034-35 (9th Cir. 1982). This would be especially
 telling when the named owners of the nonsignatory have little
 responsibility or control over the management of the company,
 and do not have a financial investment in the company. Here,
 both Belmont and Algar were formally owned by members of the
 Diaz, Bota, and Guerreiro families, and the companies were in
 fact owned, operated and managed by the same three men. 
 Significantly, the three women who "owned" Belmont and Algar
 were owners in name only: they had no financial investment in
 the company, and performed primarily secretarial work within
 the office. The evidence suggests that Sarita Diaz and
 Margaret Bota were named as owners of Algar so that Algar might
 obtain certification as a Women Business Enterprise: after
 certification was denied, Sarita Diaz and Margaret Bota
 transferred ownership to Guerreiro and Bota without receiving
 financial consideration in return.
 As to the other prongs of the alter ego test, it is 
 undisputed that Belmont was and Algar is in the construction
 business performing concrete work in Massachusetts. It is
 undisputed that their offices are in the same building,
 although on different floors. It is undisputed that the
 companies are managed and supervised by the same three people: 
 Diaz, Bota, and Guerreiro. It is also clear that the two
 companies shared a large number of employees, that a
 substantial portion of each company's work was for the same
 client, and that the companies shared equipment through
 informal leasing arrangements.
 The district court did not reach a decision on
 whether there was anti-union animus, other than to say that the
 evidence was suggestive of its existence. A finding of anti-
 union animus is not essential to sustain a finding that Belmont
 and Algar are alter egos. See Hospital San Rafael, 42 F.3d at
 51. The other evidence is sufficient to support the conclusion
 that a reasonable finder of fact would have to conclude that
 Algar is Belmont's alter ego.
 Regarding damages, we have carefully reviewed the
 district court's determination of damages and are satisfied
 that it was correct. As the district court aptly points out,
 there is no credible evidence to support the defendants'
 argument that certain work was "grandfathered" into the
 Agreement and therefore not subject to its requirements; such
 an understanding is certainly not present in the language of
 the Agreement.
 The decision of the district court is affirmed. 
 Costs are awarded to MCCCA.